Eric N. GIBSON, Appellant,

v.

UNITED STATES, Appellee.

No. 92–CF–745.

District of Columbia Court of Appeals.

Argued March 24, 1993.

Decided Oct. 14, 1993.

William T. Morrison, Mason City, MD, appointed by this court, for appellant.

Daniel M. Zachem, Asst. U.S. Atty., with whom Jay B. Stephens, U.S. Atty. at the time the brief was filed, and John R. Fisher and David E. Mills, Asst. U.S. Attys., Washington, DC, were on the brief, for appellee.

Before TERRY, STEADMAN, and SULLIVAN, Associate Judges.

TERRY, Associate Judge:

Appellant Gibson was convicted of assault with a dangerous weapon,[1] possession of a firearm while committing a crime of violence,[2] carrying a pistol without a license,[3] possession of an unregistered firearm,[4] and unlawful possession of ammunition.[5] His main contention on appeal is that the trial court abused its discretion when it refused to grant a continuance of his trial. He also argues that the court committed plain error when it failed to declare a mistrial *sua sponte* in response to certain testimony. We affirm.

I

A. *The evidence at trial*

At about 4:00 p.m. on April 2, 1991, Martin Jenkins, Robert Wade, and Christopher Owens were walking along Florida Avenue on their way to a playground in the 1400 block of V Street, N.W. As they neared the playground, they decided to stop at a telephone booth on Florida Avenue to call another friend named Paul and invite him to join them for a game of basketball. The phone was then being used by another young man, and appellant Gibson was standing nearby,

1. D.C.Code § 22–502 (1989).

2. D.C.Code § 22–3204(b) (1989).

3. D.C.Code § 22–3204(a) (1989).

4. D.C.Code § 6–2311(a) (1989).

5. D.C.Code § 6–2361 (1989).

apparently waiting for the phone conversation to end. Jenkins, Wade, and Owens were all acquainted with Gibson.[6]

Jenkins remarked, to no one in particular, that he would be able to use the telephone when Gibson's friend had completed his call. Gibson, however, apparently took offense at Jenkins' comment and asked Jenkins what he would do if his friend did not get off the phone. The discussion quickly escalated into a "very unfriendly" argument, but no blows were exchanged. Gibson's friend then finished his phone call, and he and Gibson left through an alley. As they walked away, Gibson said, "I'll be back."

Jenkins then called his friend Paul and arranged to meet him near the phone booth. While Jenkins and his friends waited for Paul, Gibson returned with another companion (not the same one who had been using the phone earlier). After "mumbling something" from across the street, Gibson suddenly drew a gun. Jenkins said, "If you pull that gun, you better use it," whereupon Gibson fired it once directly at Jenkins, striking him in the ankle. When Gibson tried to shoot again, however, the gun failed to fire. Both groups then ran away. Jenkins later received treatment for his wound at Washington Hospital Center, and at trial he testified that he still felt "a little pain" from the injury.

Jenkins, Wade, and Owens all positively identified Gibson in court as the shooter, to the exclusion of all others, including Gibson's brother. In addition, a detective testified that Jenkins selected Gibson's photograph from an array of nine photographs and identified the man in the picture as his assailant.

Gibson testified that he knew both Wade and Owens and had a friendly relationship with each of them. Although he did not

know Jenkins, he admitted having seen him occasionally and believed that there was no animosity or bad feeling between himself and any of the three government witnesses. Gibson could not recall where he was at the time of the shooting, but he denied ever firing or even possessing a gun.

### B. *The request for a continuance*

When the case was first called for trial on Thursday, January 23, defense counsel told the court that "within the last twenty minutes [he had] listened to the radio run in this case" and that on the tape recording there was a reference to the possible involvement of twins. Consequently, counsel said, "it may be necessary" to move for a continuance to investigate a potential conflict of interest. Counsel informed the court that he currently represented both Gibson and his brother, Kenneth Williams, and that the two of them looked very much alike, although they were not twins. He expressed concern that a potential conflict of interest might arise if he had to call Gibson's brother as a witness. After a brief discussion with both counsel, the court decided to take testimony from the officer who made the radio broadcast because there might be a *Brady* issue[7] in the case.

Officer Vernon Bailey testified that on April 2, 1991, between 3:00 and 3:30 p.m., he heard over the radio a lookout for a pair of twins who might have been involved in "something to do with drugs" on Belmont Street, N.W. Since he was on scooter patrol at the time, he rode over to Belmont Street, which was only a block away, to assist the officers who were investigating "the twins incident." Officer Bailey never found the twins, nor did he know who they were or whether any other officers had arrested them.[8]

---

6. Although Jenkins did not know Gibson by name and had no idea where he lived, he had seen him "around in the neighborhood." Wade had known Gibson for "a while" from the Boys' Club and from paper routes. Owens had also had a paper route with Gibson and had known him for five or six years. Each of the three witnesses testified that he knew, or had seen, Gibson's brothers on several occasions and could distinguish Gibson from each of his brothers.

7. *See Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

8. Officer Bailey testified, "Other than helping the officers at that time involved with the twins, looking for them, and then going back to my beat, I don't know anything other than [the fact that they supposedly lived on Belmont Street]." At another point defense counsel asked the officer whether he knew that appellant Gibson lived on Belmont Street, and Bailey replied, "No, other than seeing him today, I don't know him."

About an hour later, shortly after 4:00 o'clock, Officer Bailey was "making a business check" in a liquor store at 14th and W Streets when John Jenkins, the brother of the shooting victim in this case, approached him and reported that his brother Martin had been shot. Officer Bailey, recalling the prior incident on Belmont Street, and aware that John Jenkins knew "everyone in the neighborhood," asked him if "the twins" were involved. Jenkins replied, "I don't know, they could be."[9] Bailey radioed a scout car on Belmont Street and asked the responding officer to find out whether the twins had been apprehended so that they might be brought to him for a possible identification by the witnesses to the shooting of Martin Jenkins. The twins, however, were never arrested and thus were never viewed by any of the witnesses in this case.

Officer Bailey made clear that he was merely acting on a hunch when he inquired about the possible involvement of the twins in the shooting:

Q. [by defense counsel]: Have you ever investigated any matter where the term twins ... was applied to Mr. Gibson and Mr. Williams?

A. Not that I know of.

\* \* \* \* \* \*

Q. And so when you asked [John Jenkins whether the twins were involved], what were you thinking of?

A. Because the prior incident that I had been associated with that day involved these twins on Belmont Street, and I knew that something was going on in the area. I asked John just in case they were involved.

It's not a matter of my having positive information that they were involved, and John himself was not clear as to what went down. All he knows is, his brother had been shot, and he loaned him the truck to go to the hospital, and I was getting information from John second-hand.

After Officer Bailey finished testifying, the prosecutor told the court that the witnesses to the shooting had identified Gibson by name, that at least two of them had known him from the neighborhood, and that no witness had made any reference "to twins or to brothers of the defendant." Defense counsel conceded that he had no way of knowing whether the testimony at trial would cause him to withdraw from the case. Although he commented that the possible involvement of Gibson's brother was "an area of some concern," counsel did not move to withdraw, nor did he suggest any investigation that he might undertake if the court were to postpone the trial.

The court denied the request for a continuance. Although recognizing that "there could be some circumstances" in which defense counsel might have to present Gibson's brother to the jury to demonstrate that the two brothers resembled each other, the court concluded that there was no "real probability that any of this is going to come about...." The court ruled that there was no basis for "granting a continuance so that the matter can be further investigated or for [counsel] to determine that he should withdraw as counsel in this case." Defense counsel never raised the issue again.

The court then turned to the admissibility of the photographic array. After an evidentiary hearing, it ruled the photographs admissible and then adjourned for the day. The following day, Friday, January 24, a jury was selected but not sworn. On Monday, January 27, the jury was sworn, and the trial began with the testimony of Martin Jenkins.

## II

Gibson contends that the trial court should have granted a continuance to enable his counsel to investigate a possible conflict of interest which could have arisen at trial if counsel, in presenting a mistaken identity defense, found it necessary to inculpate Gibson's brother, whom he represented in another case.[10] He speculates that counsel might

---

9. John Jenkins was not a witness to the shooting of his brother Martin. He did not learn of it until Martin asked him for the loan of his truck so that he could go to the hospital.

10. Gibson is represented by different counsel on appeal.

have found it necessary to present defense witnesses (or to cross-examine government witnesses) who might, in exculpating Gibson, possibly incriminate Kenneth Williams, Gibson's look-alike brother. During this continuance, Gibson now argues, counsel could have investigated the matter and, if necessary, moved to withdraw from the case.

The Sixth Amendment guarantees the accused in a criminal case the right to the effective assistance of counsel for his or her defense. *E.g., Cuyler v. Sullivan,* 446 U.S. 335, 343, 100 S.Ct. 1708, 1715, 64 L.Ed.2d 333 (1980); *Douglas v. United States,* 488 A.2d 121, 135 (D.C.1985). Encompassed within this guarantee is the right to representation by counsel "whose loyalty is undiluted by conflicts of interest.... Threats to this right most commonly occur when a single attorney represents multiple defendants with conflicting interests.... For example, an attorney may refrain ... from presenting a defense that helps one client but harms another...." *Fitzgerald v. United States,* 530 A.2d 1129, 1133 (D.C.1987) (citations omitted).[11]

The precise issue before us is whether the trial court erred in refusing to grant a continuance so as to enable defense counsel to investigate the possibility of a conflict of interest. This and other courts have repeatedly held that the grant or denial of a continuance is a matter resting in the sound discretion of the trial court, and that its decision either way will not be reversed except on a showing of "clear abuse." *Adams v. United States,* 502 A.2d 1011, 1025–1026 (D.C.1986) (citations omitted); *see Ungar v. Sarafite,* 376 U.S. 575, 589, 84 S.Ct. 841, 849, 11 L.Ed.2d 921 (1964). We find no such abuse in this case.

■ The trial judge did not have enough information before him to warrant the grant-

ing of a continuance based on a possible conflict of interest. The only basis for the suggestion of a conflict was the fact, unremarkable in itself, that appellant Gibson looked like his brother. Although counsel represented both brothers in different matters, there was absolutely nothing before the court to suggest that Gibson's brother might be involved in the shooting of Martin Jenkins. Officer Bailey's testimony about "the twins incident" established, at most, that an hour or so earlier a pair of twins had been involved in "something to do with drugs" on Belmont Street, a few blocks away from the scene of the shooting. Aside from the fact that Gibson, and perhaps his brother as well, lived on Belmont Street, there was nothing to connect either of them with the twins. Even if we assume that Gibson and his brother were the supposed twins, that "fact" alone would not establish a conflict of interest because there was no other proof, or even a proffer, that Gibson's brother was anywhere near the scene of the shooting.

Most importantly, counsel never spelled out what he hoped to investigate if the court were to grant his motion for a continuance. We note that the motion was denied on a Thursday, but that the jury was not selected until Friday, and the trial did not actually begin until the following Monday. Thus, if counsel thought there might be any likelihood of a conflict of interest, he had an entire weekend to undertake whatever investigation he desired; apparently, however, he did not bother to do so. Nor, after trial, did he file a motion for new trial based on newly discovered evidence.[12] Even now on appeal, Gibson's newly appointed counsel has not made any proffer that would warrant a remand for further proceedings on the conflict of interest issue, nor has he claimed that trial counsel was ineffective for failing to pursue the matter further.

---

11. Gibson's brother, of course, was not a defendant or even a suspect in this case. Before trial the prosecutor proffered to the court that none of the eyewitnesses (who all knew Gibson and his brothers and could tell them apart, and who all had positively identified Gibson as the shooter) had ever mentioned Gibson's brother as a participant in the shooting. The trial testimony was consistent with this proffer.

12. Under Super.Ct.Crim.R. 33, a defendant may file a motion for new trial based on newly discovered evidence within two years after the entry of judgment. Since the judgment in this case was entered on June 12, 1992, Gibson still has until June 12, 1994, to file such a motion—assuming he has the newly discovered evidence to support it. Of course, we take no position on whether such a motion, if filed, should be granted.

Gibson contends nevertheless that the trial court should have *sua sponte* investigated whether a potential conflict of interest existed before denying the motion for a continuance. This argument is without merit.

To protect the right of a defendant to conflict-free counsel, and to enable trial judges to distinguish actual conflicts from those that are merely speculative or hypothetical, we have held that "the trial court has an affirmative 'duty to inquire' into the effectiveness of counsel whenever 'the *possibility* of a conflict' becomes apparent before or during trial." *Douglas, supra*, 488 A.2d at 136, citing *Wood v. Georgia*, 450 U.S. 261, 272, 101 S.Ct. 1097, 1104, 67 L.Ed.2d 220 (1981) (emphasis in *Wood*); *see also* Super.Ct.Crim.R. 44(b).[13] The court's responsibility is to "conduct an inquiry to determine whether an actual conflict exist[s] . . . ." *Witherspoon v. United States*, 557 A.2d 587, 591 (D.C.1989); *see Singley v. United States*, 548 A.2d 780, 784 (D.C.1988). But that responsibility arises, as *Singley* makes clear, only when there are facts "sufficient to alert the trial court to 'the *possibility* of a conflict' . . . ." *Id.* (citations omitted). The facts in this case do not rise to that level.

There was nothing before the trial court to connect Gibson's brother with the shooting of Martin Jenkins. Officer Bailey had no information that the supposed twins were involved in the shooting; at most, the officer's testimony suggested that Gibson's look-alike brother might have been involved in a separate drug-related incident in the same general neighborhood earlier that day. The prosecutor proffered to the court that Gibson had been identified by name and was known personally to at least two of the eyewitnesses to the shooting; this proffer was borne out by the subsequent testimony at trial. We have already held that the trial court did not abuse its discretion in concluding, on these

facts, that a conflict of interest was not a "real probability" and that there was no reason to grant a continuance.[14] We further hold that the facts were insufficient to trigger the court's duty under *Douglas, Witherspoon*, and *Singley* to inquire into the possibility of a conflict of interest.

### III

Gibson maintains that the trial court committed plain error when it did not *sua sponte* declare a mistrial after one witness testified that he believed Gibson and his brother were twins and another witness said that he was unsure whether Gibson and his brother had ever been described as twins.

▮ To declare a mistrial *sua sponte* without raising a double jeopardy bar to retrial, the trial court would have had to find that a conflict of interest actually affected the adequacy of defense counsel's representation of Gibson, so that a mistrial was a manifest necessity. *Witherspoon, supra*, 557 A.2d at 590; *Douglas, supra*, 488 A.2d at 126; *see Mack v. United States*, 570 A.2d 777, 782 (D.C.1990). "An alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Foxworth v. Wainwright*, 516 F.2d 1072, 1079–1080 (5th Cir. 1975), quoted with approval in *Fitzgerald, supra*, 530 A.2d at 1138. The record clearly demonstrates that defense counsel's decision not to raise a mistaken identity defense was not affected by any conflict of interest but rather was the result of a reasonable tactical choice.

The government's first witness was the shooting victim, Martin Jenkins. Jenkins knew Gibson from the neighborhood and positively identified Gibson as the person who shot him. On cross-examination Jenkins demonstrated a clear ability to distinguish

---

**13.** Rule 44(b) requires the trial court, whenever two or more defendants in the same case are represented by the same attorney, "promptly [to] inquire with respect to such joint representation and . . . personally [to] advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the Court shall take such measures as may be appropriate

to protect each defendant's right to counsel." The corresponding federal rule, FED.R.CRIM.P. 44(c), contains identical language.

**14.** It is significant that at no time did counsel ever believe the potential for conflict was so real as to oblige him to seek leave to withdraw from the case.

between Gibson and his brothers, and on redirect Jenkins stated that he had been shot by Gibson and not by his brother.

The second witness was Robert Wade, who testified that Gibson had in his hand what appeared to be a gun just before he heard a gunshot. Wade knew Gibson from the Boys' Club and newspaper routes; he also knew Gibson's brothers and could distinguish them from Gibson. On cross-examination Wade said that he thought Gibson and his brother Kenneth Williams were twins, but that he could tell them apart by their complexions:

Q. [by defense counsel]: You thought they were twins?

A. Yes, but you can tell the difference. One is lighter, one is darker.

Finally, Christopher Owens testified that he had worked on a paper route with Gibson and had known him for five or six years. Owens was unsure whether Gibson and his brother had ever been described as twins, but he was certain that the person who shot Martin Jenkins was Gibson and not either of his brothers.

Thus defense counsel was faced with three eyewitnesses, all of whom had known Gibson and his brothers for varying lengths of time. All three were cross-examined about a possible resemblance between Gibson and one of his brothers, and all three testified that they could distinguish between Gibson and that brother. Jenkins and Owens positively identified Gibson as the gunman, to the exclusion of his brother. Wade placed Gibson at the scene of the shooting with what appeared to be a gun in his hand. Given this testimony, it is not at all surprising that counsel did not press any claim that Gibson's brother, rather than Gibson, was the gunman.

In *Cuyler* the Supreme Court remarked that a trial court "necessarily [relies] in large measure on the good faith and good judgment of defense counsel" in bringing to the court's attention the possibility of a conflict of interest. 446 U.S. at 347, 100 S.Ct. at 1717 (citing *Holloway v. Arkansas,* 435 U.S. 475, 485–486, 98 S.Ct. 1173, 1179–80, 55 L.Ed.2d 426 (1978)). Counsel in this case never told the court that he was in any way restrained or hindered in his representation

of Gibson by a conflict of interest. In light of the unequivocal identifications of Gibson as the gunman by three eyewitnesses, it is reasonable to conclude that counsel's decision to drop the subject of mistaken identity was not the product of a conflict but a sensible tactical choice. Since there is nothing in the record to suggest that an actual conflict of interest adversely affected counsel's performance, *see Douglas, supra,* 488 A.2d at 136, we hold that the trial court did not commit plain error in failing to declare a mistrial *sua sponte* when counsel chose not to pursue a misidentification defense.

*Affirmed.*