Anthony C. DERRINGTON, Appellant,

v.

UNITED STATES, Appellee.

Nos. 93–CF–1335, 95–CO–101.

District of Columbia Court of Appeals.

Argued May 8, 1996.
Decided Aug. 1, 1996.

---

10. *See Kersey, supra,* 520 A.2d at 326–27.

11. See majority opinion at 1115–1116.

Deborah A. Persico, Alexandria, VA, appointed by this court, for appellant.

Leanne Shaltis Fallin, Assistant United States Attorney, with whom Eric H. Holder, Jr., United States Attorney, and John R. Fisher and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before SCHWELB and RUIZ, Associate Judges, and PRYOR, Senior Judge.

SCHWELB, Associate Judge:

Anthony Derrington was convicted of selling crack cocaine to an undercover officer. He contends on appeal that his trial attorney, Douglas Wood, Esq., had a disqualifying conflict of interest and that Wood's performance was otherwise constitutionally deficient. The government responds that any conflict of interest was hypothetical or speculative, and that Wood's representation of Derrington satisfied constitutional standards. Concluding that an actual conflict of interest adversely affected Wood's representation, we reverse.

## I.

## BACKGROUND

On December 4, 1991, Derrington and his co-defendant, Ricky Tillery, were charged by grand jury indictment with one count of distribution of cocaine and one count of posses-sion of cocaine with intent to distribute it. *See* D.C.Code § 33–541(a) (1993). Derrington retained Wood to represent him with respect to these charges,[1] and Tillery was represented by Bernard Grimm. Wood and Grimm were former law partners, and they shared office space.

When Derrington retained Wood, Wood also represented Donald "Pig" Taylor. Pig Taylor was a defendant in the so-called R Street Crew case, an unrelated prosecution in the United States District Court for the District of Columbia. At that time, Grimm also represented McKinley Board, another defendant in the R Street Crew case.

### A. The Pre–Trial Proceedings.

At a status hearing on October 21, 1992, nearly six months before Derrington's trial, Wood informed the judge that he might have to withdraw as Derrington's attorney because of a potential conflict of interest. Wood told the judge at a bench conference:

> I represent Mr. Derrington in this case and in another case. And, yesterday, Mr. Grimm was in a trial, the R Street trial, over in federal court and it came out at that trial [that] Mr. Derrington was ... an informant in that case against the R Street Crew. I represented [Donald Taylor,] one of the members of that ... alleged organization for two to three years on a variety of matters. Mr. Derrington denies that he worked with the government as an informant.
>
> \* \* \* \* \* \*
>
> I raised the issue with Mr. Derrington this morning. He denies it. I've prepared a motion to withdraw.[2]
>
> What I would like to do is probably, if we could continue this—and I can contact Mr. Duncan [the prosecutor in the R Street Crew case] to find out if Derrington is the informant.

---

1. Wood also represented Derrington in another criminal case, which Wood described as "[a] drug case, [the] same type of case."

2. The text of Wood's motion to withdraw, which was never filed, is quoted in Derrington's memo-randum in support of his supplemental motion for a new trial. Wood is quoted as having said: "Counsel submits that this is a glaring conflict of interest."

Wood explained the potential conflict as follows:

> If [Derrington is the informant], then I'd have to withdraw. Because Mr. Derrington has this case and another case and he would need someone to bargain for him to get—to help out with these cases and probably use as a bargaining chip . . . his informant status.

The status judge inquired whether Wood's relationship with Taylor was ongoing. Wood responded:

> I represented him prior to my representation of Derrington. Mr. Taylor pled guilty [in the R Street Crew case]. . . . Sentencing is coming up in about three weeks. But, the problem is that in order to bargain for Mr. Derrington, I would have to say to the prosecutor well you know Mr. Derrington cooperated against the R Street Crew, he did this, that, he was an informant, got paid, gave them reliable information. . . .

The judge stated that "it may be a false conflict in the timing," apparently meaning that the dual representation perhaps did not present an actual conflict because Taylor had already entered a plea of guilty in the R Street Crew case and was about to be sentenced. However, Wood explained that "it hurts my relationship with Mr. Taylor if he finds out that I represented someone who's cooperating in the R Street [case]."

The judge agreed that a continuance was necessary to determine whether a conflict existed, and he addressed Derrington as follows:

> Mr. Derrington, Mr. Wood will explain to you what we were talking about up here. The long and short of it though is that it may be necessary for him to withdraw as your lawyer in this case and for you to get another lawyer in this case and in another case [in] which he represents you.
>
> It's not clear whether it's going to be necessary or not until he talks to you further and talk[s] to others. So, I'm going to bring you back here . . . next week

> . . . for Mr. Wood to tell me whether he's going to be able to represent you in this case or not. If he is, then we'll go forward as planned and you'll tell me what you want to do about this case and your other one. If he's not able to represent you, . . . you'll certainly have an opportunity to retain another lawyer.

At the next status hearing on October 29, 1992, Wood reported:

> I've looked into [the potential conflict,] and I don't believe it's a conflict. . . . I've explained to the United States Attorney here today and I've talked about what my client—I've made some phone calls.

The judge responded:

> That's good enough for me. . . . [A]s far as I'm concerned that is between you and your client, I see no reason to inquire further. I trust you have explored that with who[m]ever you need to, to protect yourself and Mr. Derrington.

At the October 29 hearing, Derrington indicated that he wanted to go to trial rather than to accept a plea offer. During the six months which elapsed prior to the commencement of Derrington's trial, Wood did not discuss with Derrington the latter's option of cooperating with the prosecutors in exchange for more lenient treatment, nor did he approach the prosecutors to request dismissal of the charges, or any other favorable treatment, based on any past or potential cooperation by Derrington.

### B. The Trial.[3]

A jury trial commenced on April 6, 1993. The government introduced evidence, which was apparently credited by the jury, showing that on November 19, 1991, Derrington and Tillery sold a zip-lock bag of crack cocaine to Gary Curtis, an undercover officer. Officer Curtis used twenty dollars in pre-recorded funds to pay for the contraband. After the transaction was complete, Curtis returned to his vehicle, field-tested the cocaine, and broadcast a lookout describing Derrington and Tillery. Within minutes, Derrington was

---

**3.** The trial transcripts are not in the record. The following facts are therefore taken primarily from the parties' briefs.

spotted with some other individuals. Two officers observed him drop to the ground what turned out to be thirty-nine dollars, including ten dollars of the pre-recorded funds, and a white zip-lock bag containing crack cocaine. Derrington was detained, and Officer Curtis, who had returned to the scene, positively identified him as one of the sellers.[4] Detective Charles Culver, who was qualified as a narcotics expert, testified that the cocaine in each of the two zip-lock bags, i.e., the bag dropped by Derrington and the bag purchased by Officer Curtis, had a purity of ninety-three percent, indicating a high probability that the contents of each bag came from the same source.

Although Derrington did not testify, Wood called two witnesses on Derrington's behalf. James Bouknight testified that, when the police arrived, he and Derrington had been playing chess on the back hood of Derrington's car for approximately one hour. According to Bouknight, a group of people had gathered to watch the game, and Ricky Tillery was part of that group. He testified that he did not see anyone selling drugs, and that Derrington never left the chess game. Donald Deans testified that he observed Derrington and Bouknight playing chess for about an hour before the police arrived, and that he did not see Derrington sell drugs to anyone.

In addition to calling Bouknight and Dean, Wood also sought to establish that the police had falsely accused Derrington of the crime in order to obtain leverage against him and to pressure him into providing information about the September 1991 murder of a man named Michael Green. Wood mentioned this theory in his opening statement to the jury. He also cross-examined Officer Curtis and Detective Truesdale about the Green homicide, but the officers denied any knowledge of it.

4. Tillery was separately apprehended and identified.

5. The charges against Tillery were dismissed as a result of his guilty plea in an unrelated federal case.

6. When the jury returned its verdict, Derrington attempted to flee from the courtroom, but he was promptly apprehended.

The jury convicted Derrington[5] of both charges on April 9, 1993.[6] On September 17, 1993, Derrington was sentenced to concurrent prison terms of ten to thirty years.

## C. The Post–Conviction Proceedings.

On April 16, 1993, Derrington wrote a letter to the trial judge in which he stated:

> Your honor, I'm not a drug dealer. And I feel if I'd been effectively assisted by counsel, [whom] I hired, this would [not] have been proven beyond a reasonable doubt. My attorney Mr. [Wood] never investigated the case. He never called my key witness, or the other witness.... My case was inadequately prepared.... I would like the court to appoint a lawyer to represent me during my appeal. Upon doing so, I'll need him to contact the [prosecutor's] office on a case, [f]or I'm a key witness to a homicide that happened around my neighborhood. The defendant as charged for the homicide resides in this facility. Your honor, I also found out that Mr. [Wood] has been representing the defendant from the beginning [who is] charged with the homicide. The resident [saw] me and said, "I know you'r[e] not testifying now." This is why I'm [in] protective custody.... My name also came up in the R Street Gang case as the one who told [where] the stash house was....

The trial judge treated this letter as a motion for a new trial based on ineffective assistance of counsel, and appointed a new attorney to represent Derrington. On July 8, 1994, Derrington's attorney submitted a supplemental motion for a new trial pursuant to Super. Ct.Crim.R. 33 and D.C.Code § 23–110 (1996), in which it was claimed that Derrington received ineffective assistance of counsel because 1) prior to trial, Wood failed to investigate the case sufficiently;[7] and 2) Wood had

7. In particular, Derrington asserted that Wood failed to explore the proposed testimony of several witnesses, including a man named Ricky Monroe. According to Derrington's proffer, Monroe told a defense investigator that "it was he and not [Derrington] who sold drugs to an unknown individual in the vicinity of the charged offense." Monroe also sent the trial judge a notarized letter in which he claimed that Derrington was innocent, and that he (Monroe) was the individual

an actual conflict of interest because he simultaneously represented Donald Taylor in the R Street Crew case. A hearing was held on Derrington's claims on December 17, 1994 and January 17–18, 1995.

### 1. Donald "Pig" Taylor.

The Section 23–110 hearing revealed two potential conflicts of interest on Wood's part. First, as noted above, Wood represented Donald "Pig" Taylor in the R Street Crew case at the same time that he represented Derrington. Derrington testified that he believed that he had provided information which led to the arrest of members of the R Street Crew, including Taylor.[8] Wood first learned of the potential conflict in October 1992, when "Derrington's name came up [in a federal proceeding] as an informant on a search warrant ... for the house of somebody who was connected to the R Street Crew." At that point, Taylor had entered a plea of guilty in the federal case and was awaiting sentencing.[9] According to Derrington, Wood told him that he (Wood) would have to withdraw as Derrington's lawyer because he represented one of the members of the R Street Crew.

Although Wood did not withdraw, he did notify the status judge of the potential conflict, and a second status hearing was scheduled to give Wood an opportunity to determine whether an actual conflict of interest existed. Wood testified that he

> called Russell Duncan, who was the prosecutor of R Street, and tried to get a sense from him if Mr. Derrington was the informant [who] was used [as the basis] of a warrant, and then I talked to Mr. Derrington.

> \* \* \* \* \* \*

> with Tillery who sold drugs to the undercover officer.

**8.** This alleged nexus between the information provided by Derrington and the prosecution of Taylor was contradicted by prosecutor Russell Duncan, who stated in an affidavit that "Anthony Derrington never provided any information affecting the prosecution of Donald Taylor."

**9.** Taylor entered his plea on September 4, 1992. He was sentenced on November 23, 1992.

Mr. Derrington told me he wasn't the informant, so that made me think that there wasn't a conflict.

Derrington subsequently acknowledged that he had denied being an informant when Wood first asked him about it. However, Derrington testified that he told Wood, at some point prior to his trial, that he (Derrington) had provided information to the police about the R Street Crew.

Derrington further testified that, when he learned that Wood also represented Taylor, he immediately asked Wood to refund his money. According to Derrington:

> Well, [Wood] said, well hold on, let me get a hold of my other client and see if it's all right if, you know, I take the case and [Derrington] said, no that's all right. I just want my money back.

Wood testified that Derrington asked for his money back after he was convicted, but acknowledged that "maybe" Derrington first requested a refund upon learning that Wood represented Taylor. Wood explained that he did not return the money because he believed he had done enough work to warrant keeping the fee.

Derrington alleged at the Section 23–110 hearing that Wood's representation of Taylor constituted ineffective assistance of counsel "[b]ecause [Detective] Johnson was going to try to use me ... in the R Street Crew case, against [Pig] Taylor and them." He stated that he no longer trusted Wood after he learned of Wood's simultaneous representation of Taylor, but he never brought his dissatisfaction to the attention of any judge until after his conviction at trial. Derrington also admitted that Detective Johnson never actually said that he (Derrington) would be a witness in the R Street Crew case.[10]

Wood testified, on the other hand, that

**10.** This statement was corroborated in part by an affidavit submitted by prosecutor Russell Duncan, in which Duncan stated:

> 6. Anthony Derrington was never a government witness at either "R Street Crew" trial, never agreed to cooperate with the government in these cases or this indictment, and always denied his involvement as an informant. I did not believe him. He was not called as a witness by any defendant.
> 7. To the best of my recollection, Anthony Derrington never provided any information af-

Mr. Derrington had related to me [that] there was some meeting ... [with] Mr. Duncan, Russell Duncan, and some police officers, and they were pressuring him to testify about R Street....

Wood also acknowledged that Derrington "could have somehow ended up being a witness against Mr. Taylor." According to Wood, "Derrington, if he wanted to, could have testified ... for the government in the R Street Crew [case]. He could have, sure." When asked whether he had any reason to believe that Derrington would have willingly collaborated with the government, Wood responded in the negative "unless they offered him something [extra]ordinary."

Wood testified that his representation of Pig Taylor had no effect on his representation of Derrington in terms of witnesses, defense theories, pretrial investigation, or trial performance.[11] Nevertheless, Wood stated candidly: "I suppose in retrospect, I should have withdrawn from the case.... I don't disagree that maybe I shouldn't have been representing Mr. Derrington." When the trial judge asked Wood why he believed he should have withdrawn, Wood explained:

Well, basically in retrospect, ... if Mr. Derrington had valuable information about Mr. Taylor or probably not [about] Mr. Taylor specifically but [about] the R Street Crew in general, maybe he should have

been told to testify against them all. That's all. That obviously would have been an option for Mr. Derrington.

\* \* \* \* \* \*

[I]f the circumstances had been different, maybe Mr. Derrington should have been persuaded, I'm not saying he would have wanted to, to testify in the R Street case. I didn't explore with Mr. Derrington whether he testified against the R Street Crew, I didn't explore with the United States Attorney's Office whether or not they were willing to offer Mr. Derrington a plea bargain or a better resolution of these cases if he was willing to testify in the R Street Crew [case]. What I'm saying is, in retrospect, maybe that should have been done.

### 2. Sean Branch.

The second potential conflict of interest raised at the hearing involved a man named Sean Branch, who was ultimately convicted of murdering Michael Green. Green was killed in September 1991 in Derrington's neighborhood, the same neighborhood where Derrington allegedly sold cocaine to the undercover officer. Although Derrington did not testify that he in fact witnessed the Green murder, he stated that the police believed that he had information relating to

---

fecting the prosecution of Donald Taylor. Mr. Taylor was indicted principally as the result of undercover work by the Metropolitan Police Department and pled guilty before the second R Street trial. I did not intend to call Mr. Derrington as a witness at Mr. Taylor's planned trial.

11. During Wood's cross-examination, the following exchange took place:

Q Now, Mr. Wood, to the best of your recollection, is there anything that you did or did not do in representing Mr. Derrington that you would have done or you felt you should have done because you represented Donald Taylor ...?

A Well, I don't think it's so much in the investigation. I mean *I suppose in retrospect, I should have withdrawn from the case* ... [and] not get involved in this.

\* \* \* \* \* \*

Q Were there any witnesses that you would have called at Mr. Derrington's [trial] that you didn't call because you also represented Donald Taylor?

A If you're confining it to witnesses, I don't think there [were] any witnesses I didn't call because of Donald Taylor.

Q Was there any theory of the defense at Mr. Derrington's trial that you didn't present because you were representing Donald Taylor ...?

A ... [N]ot probably that occurred to me at the time.

Q Was there any pretrial investigation that you didn't undertake for Mr. Derrington that you would have undertaken but for the fact that you had also represented Donald Taylor?

\* \* \* \* \* \* \*

A ... [T]he investigation wasn't curtailed because of Mr. Taylor.

Q Was any of your trial performance curtailed because of Mr. Taylor?

A No, but I mean, you know, *I don't disagree that maybe I shouldn't have been representing Mr. Derrington.*

(Emphasis added).

that murder. Wood also testified that he "didn't have any reason to doubt Mr. Derrington telling [him] that he was a witness" to the Green murder. The potential conflict arose because Wood represented Branch from March to June 1992.[12] Wood also stood in for Grimm, who represented Branch in one or more other criminal cases, on at least one occasion during Wood's representation of Derrington.

Based on the testimony at the Section 23–110 hearing, however, it is unclear whether Wood was aware during his representation of Derrington that Branch was a suspect in the Green murder. According to Wood's testimony, "there was no murder trial of Sean Branch for Mike Green's death until much, much later. Sean Branch wasn't charged with the Mike Green murder until, I think, at least a year [after Derrington's trial]." Wood had "trouble figuring out when [he] heard" that Branch was suspected of murdering Green, although he "eventually heard" that Branch was a suspect. Wood testified that Derrington told him he had reason to fear Branch, and that Derrington "may have" told him Branch was an "enforcer" for the R Street Crew. Wood also stated, however, that "a lot of people were afraid of Sean Branch."

Wood testified that his simultaneous representation of Branch had no effect on his representation of Derrington in terms of witnesses, defense theories, or trial performance. However, when the prosecutor asked whether the dual representation affected Wood's pretrial investigation of Derrington's case, Wood stated:

No. I mean the only thing I can think of, that maybe if Mr. Derrington had wanted to testify against those guys.[13]

\* \* \* \* \* \*

He didn't say he wanted to testify at the time. But, you know, I'm not saying I shouldn't have, you know, persuaded him to do that.

### 3. The Trial Judge's Rulings.

After Derrington, Wood, and Detective Johnson testified, the judge heard argument from counsel on Derrington's claims. The judge made no explicit factual findings; however, at the conclusion of the hearing, the judge ruled as follows:

I think for the reasons stated by the government in argument and in [its] pleadings and the record herein, Mr. Derrington has failed to meet the second prong of the [test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984),] with his alleged deficiencies regarding investigation [and] calling of witnesses.... There just is no showing that there's a reasonable probability that something would have resulted in a different outcome, something in the record, there's just very little there[.] [Derrington also] has failed to meet the burden of proof set forth in [*Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), and *Douglas v. United States*, 488 A.2d 121 (D.C.1985) ]. So, the motion is denied.

Derrington appeals from these rulings.

## II.

## LEGAL DISCUSSION

### A. Standard of Review.

■ "For purposes of appellate review, the trial court's determination whether counsel was ineffective presents a mixed question of law and fact." *Byrd v. United States*, 614 A.2d 25, 30 (D.C.1992) (citing *Curry v. United States*, 498 A.2d 534, 540 (D.C.1985)). This court's standard of review is "a deferential one." *Bowman v. United States*, 652 A.2d 64, 73 (D.C.1994). "We accept the judge's factual findings unless they lack evidentiary support, but we review his [or her] legal conclusions *de novo*." *Byrd, supra*, 614 A.2d at 30. This standard of review applies to all ineffective assistance of counsel claims, including those based on an attorney's con-

---

12. According to Wood, Branch was charged with assault with a deadly weapon in an unrelated incident. That case was ultimately dismissed.

13. Wood may perhaps have been referring to members of the R Street Crew, and not Branch specifically, when he used the expression "those guys."

flict of interest. *See, e.g., Cuyler, supra,* 446 U.S. at 341–42, 100 S.Ct. at 1714–15.

### B. Legal Principles.

■ "The Sixth Amendment guarantees the accused in a criminal case the right to the effective assistance of counsel for his or her defense." *Gibson v. United States,* 632 A.2d 1155, 1158 (D.C.1993). "The first essential element of effective assistance of counsel is counsel's ability and willingness to advocate fearlessly and effectively on behalf of his client." *Douglas, supra,* 488 A.2d at 135 (citations and internal quotation marks omitted). Therefore, whenever "a constitutional right to counsel exists, ... there is a correlative right to representation that is free from conflicts of interest." *Singley v. United States,* 548 A.2d 780, 783 (D.C.1988) (quoting *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981)). "Encompassed within the Sixth Amendment's guarantee of effective assistance of counsel is the right to representation by counsel whose loyalty is undiluted by conflicts of interest." *Fitzgerald v. United States,* 530 A.2d 1129, 1133 (D.C.1987) (footnote omitted).

■ The danger of an attorney's conflict of interest is that the "attorney may forego efforts he would ordinarily undertake on behalf of one client, in order that the other client may not thereby be harmed." *Id.*

> For example, an attorney may refrain from challenging the admission of evidence prejudicial to one client but favorable to another, or from emphasizing the culpability of one client in order to exculpate another, or from allowing one defendant to testify against another, or from presenting a defense that helps one client but harms another, or from entering a plea agreement for one client conditioned upon his testimony for the prosecution against another client.

*Id.* at 1133–34 (citations omitted).

■ An appellant challenging the constitutional effectiveness of his trial counsel "must demonstrate both deficient performance and prejudice." *Byrd, supra,* 614 A.2d at 29 (discussing *Strickland, supra* ). A claim of ineffective assistance of counsel

based on an attorney's conflict of interest, however, is evaluated pursuant to a less stringent standard than is a conventional *Strickland* claim. *See Chase v. United States,* 656 A.2d 1151, 1154 & n. 7 (D.C.1995). Under *Cuyler, supra,* and its progeny, "[e]ven in cases where a defendant does not object at trial to an attorney's representation, a Sixth Amendment violation warranting reversal will be established if a convicted defendant demonstrates on appeal that 'an actual conflict of interest adversely affected, his lawyer's performance.' " *Douglas, supra,* 488 A.2d at 136 (quoting *Cuyler, supra,* 446 U.S. at 348, 100 S.Ct. at 1718) (footnote omitted); *see also Jackson v. United States,* 623 A.2d 571, 585 (D.C.), *cert. denied,* 510 U.S. 1030, 114 S.Ct. 649, 126 L.Ed.2d 607 (1993) (quoting *Douglas* and *Cuyler* ). As the Supreme Court noted in *Cuyler,* "unconstitutional multiple representation is never harmless error.... Thus, a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief." 446 U.S. at 349–50, 100 S.Ct. at 1719; *Fitzgerald, supra,* 530 A.2d at 1138 (quoting *Cuyler* ).

■ On the other hand, "the possibility of conflict is insufficient to impugn a criminal conviction." *Cuyler, supra,* 446 U.S. at 350, 100 S.Ct. at 1719. To make the requisite showing, the appellant must be able to "point to specific instances in the record to suggest an actual conflict or impairment of [his or her] interests." *Fitzgerald, supra,* 530 A.2d at 1138 (citation and internal quotation marks omitted); *see also Gibson, supra,* 632 A.2d at 1159 ("distinguish[ing] actual conflicts from those that are merely speculative or hypothetical"). Furthermore, "[a]n alleged conflict of interest that obstructs the use of a particular strategy or defense is not significant unless the defense is plausible." *Fitzgerald, supra,* 530 A.2d at 1138 (citation and internal quotation marks omitted).

### C. The Principles Applied.

■ This is an unusual case because the record reveals remarkable congruence between Wood's foresight and hindsight regarding the problems posed by his apparent-

ly conflicting representations. At the first status hearing in 1992, Wood recognized that an attorney who represented Derrington effectively would be obliged to use any information that Derrington might have regarding criminal activities by the R Street Crew or others as a basis for cooperation with prosecutors and the possible negotiation of more favorable treatment in return. After Wood ostensibly decided that there was no conflict of interest after all, he took none of the steps which he himself had identified to the status judge as necessary and appropriate for an effective defense strategy. More than two years later, at the Section 23–110 hearing, Wood acknowledged that

1. he probably should have discussed with Derrington the latter's option to cooperate with the prosecutors, but he did not do so;

2. he should perhaps have "persuaded" Derrington to testify against the R Street Crew, but he attempted no such persuasion; and

3. he should have explored with the prosecutors potential lenient treatment in exchange for Derrington's cooperation, but he initiated no such exploration.

Wood was an experienced criminal defense attorney who obviously knew how such negotiations were carried out in the realpolitik of the criminal justice system. Nevertheless, he did not take the steps which he himself had persuasively described as essential. The record admits only a single inference as to why this occurred, and that is because of the very conflict of interest of which Wood had warned in advance. No other explanation has been suggested, and we know of none. That, no doubt, is why Wood indicated on a number of occasions at the Section 23–110 hearing that he ought not to have been representing Derrington. This record, in our view, therefore reflects a conflict of interest which requires reversal of Derrington's convictions.

### 1. Actual Conflict of Interest.

The first prong of the *Cuyler* test requires Derrington to establish that Wood had an actual conflict of interest during the time that he served as Derrington's trial attorney. Derrington's task is made substantially easier by the fact that Wood himself identified the conflict at the initial status hearing in October 1992. Wood told the judge that, if Derrington was an informant against the R Street Crew, Wood would "have to withdraw" from the case because Derrington "would need someone to bargain for him ... [and to] use as a bargaining chip ... his informant status." Wood stated quite clearly that "it hurts my relationship with Mr. Taylor [14] if he finds out that I represented someone who's cooperating in the R Street [case]." Having thus warned the status judge, Wood in fact never discussed with Derrington the possibility of Derrington's cooperating with the prosecutors, nor did Wood approach the prosecutors to request more favorable treatment for his client based on such cooperation.

The fact that Wood believed that there was a conflict of interest, and acted as though there was a conflict, constitutes strong, if not conclusive, evidence that an actual conflict existed. This court has recognized that, in determining whether a trial judge properly denied a defense request for a continuance based on a possible conflict of interest, it is "significant" whether counsel "believe[d] the potential for conflict was so real as to oblige him to seek leave to withdraw from the case." *Gibson, supra,* 632 A.2d at 1159 n. 14; *see also Gist v. State,* 737 P.2d 336, 344 (Wyo.1987) ("*bona fide* belief on the part of

14. As to Sean Branch, the prosecutor asked Wood during the Section 23–110 hearing whether his representation of Branch affected his pretrial investigation of Derrington's case. Wood responded: "[M]aybe if Mr. Derrington had wanted to testify against those guys.... I'm not saying I shouldn't have, you know, persuaded him to do that." On the other hand, the testimony at the hearing did not establish that Wood was aware during his representation of Derrington that Branch was involved in the murder of Michael Green. *See United States v. Hopkins,* 43 F.3d 1116, 1119 (6th Cir.) ("A conflict is hypothetical where ... the attorney does not in fact know of the conflict from the dual representation."), *cert. denied,* — U.S. —, 115 S.Ct. 2017, 131 L.Ed.2d 1015 (1995). Because the record is unclear as to whether a conflict of interest was created by Wood's representation of Branch, we focus our discussion on Wood's representation of Taylor and Taylor's connection with the R Street Crew.

the public defender that he was involved in an actual conflict situation" produced "exactly the same [impact] as if the actual conflict had been present"); *People v. Johnson*, 5 Cal.App.3d 851, 85 Cal.Rptr. 485, 491 (1970) (conflict of interest among co-defendants may arise, *inter alia*, "when appointed counsel believes a conflict of interest may exist"). At the time of the original status hearing, Wood believed that his representation of Derrington was likely to hurt his relationship with Taylor.[15] At the Section 23–110 hearing more than two years later, Wood stated that he probably should have withdrawn from the case. Here, as in *Gibson*, we think counsel's own assessment of his situation is significant in the determination whether there was an actual conflict of interest.

The government asserts that no conflict of interest existed, or at least that any potential conflict was hypothetical or speculative, rather than actual, because Taylor had already entered a plea of guilty by the time Wood learned that Derrington was an informant in the R Street case. Taylor's plea, however, did not negate the existence of an actual conflict of interest. In the first place, Wood continued, after the plea, to represent Taylor in his appeal in the R Street Crew case.[16] Furthermore, Wood acknowledged at the Section 23–110 hearing that it was possible that Derrington "could have somehow ended up being a witness against Mr. Taylor." Wood explained that "[i]f Mr. Taylor refused to accept the plea bargain, ... Mr. Derrington, if he wanted to, could have testified ... for the government in the R Street Crew [case]." Moreover, if Taylor's appeal was successful, Derrington's information could have been useful to the prosecution in any further proceedings.

In any event, Wood was aware of the timing of Taylor's guilty plea when he first informed the status judge of the potential conflict. The judge stated that "it may be a false conflict in the timing," but Wood responded that Derrington's informant status nevertheless "hurt [his] relationship with Mr. Taylor." If Wood himself was concerned about the effect of the dual representation, notwithstanding Taylor's guilty plea, then any potential conflict was not rendered speculative or hypothetical by that plea.

The government also contends that no actual conflict of interest existed because the information which Derrington provided to the government in connection with the R Street Crew case "was used solely to support a search warrant in a portion of the case in which Donald Taylor was not a defendant," and Derrington himself "was never, and was never intended to be, a government witness at either [R Street Crew] trial." Even accepting the government's assertion that Derrington did not provide any information which would have directly implicated Pig Taylor in criminal activity—and there was testimony to the contrary[17]—the concept of "actual conflict of interest" is not so narrowly defined. When Wood approached the status judge and described the potential conflict, he stated that

> in order to bargain for Mr. Derrington, I would have to say to the prosecutor well you know Mr. Derrington cooperated against the R Street Crew, he did this, that, he was an informant, got paid, gave them reliable information....

Wood later testified at the Section 23–110 hearing that

> if Mr. Derrington had valuable information about Mr. Taylor *or probably not [about] Mr. Taylor specifically but [about] the R Street Crew in general,* maybe he should have been told to testify against them all.

(Emphasis added). According to Wood, therefore, the conflict stemmed from Der-

---

15. Grimm apparently shared Wood's belief that Derrington's informant status was problematic. He told the status judge that "it may be a conflict that never comes to a head, but it appears unseemly."

16. The record does not disclose the nature of Taylor's appeal, but that appeal remained pending until it was dismissed in November 1993, seven months after Derrington's trial.

17. Derrington testified that he believed that the information which he had provided led to the arrest of members of the R Street Crew, including Pig Taylor. Wood also acknowledged the possibility that Derrington "could have somehow ended up being a witness against Mr. Taylor."

rington's having provided information about the R Street Crew generally, and not solely about Pig Taylor. He was worried about how Taylor would feel "if he [found] out that [Wood] represented someone who [had] cooperat[ed] in the R Street [case]." Thus, even if Derrington did not provide information against Pig Taylor specifically, and even if Derrington was not in a position to provide testimony implicating Taylor, then, nevertheless, from Wood's highly relevant perspective, an actual conflict of interest was created.

■ Furthermore, whether the government intended to call Derrington as a prosecution witness in any of the R Street Crew trials is not dispositive of the existence of an actual conflict. Even if Derrington would not have been a witness, that would not have foreclosed an attempt by Wood to "use as a bargaining chip ... [Derrington's] informant status." The government speculates that, if Wood had approached the government with an offer of Derrington's testimony against the R Street Crew in exchange for a beneficial resolution of Derrington's pending cases, the prosecutors would have rejected the offer. Wood recognized both in 1992 and in 1995, however, that Derrington's counsel was obliged to make such an approach, and that Derrington should have been apprised of the possibility that such cooperation might secure more lenient treatment for him. We cannot now know whether the strategy to which Wood referred would have borne fruit; the proof of the pudding is in the eating. The dispositive factor is that the use of Derrington's information and further cooperation was a potential weapon in defense counsel's arsenal. According to our case law, a particular defense or strategy need only be "plausible" to create an actual conflict of interest. *Fitzgerald, supra,* 530 A.2d at 1138. Derrington has established the requisite plausibility.

### 2. Adverse Effect.

■ Having concluded that the dual representation in this case created an actual conflict of interest, we turn now to the second prong of the test articulated in *Cuyler*— whether that conflict actually affected

Wood's performance. Wood testified on cross-examination that his representation of Taylor had no effect on his selection of witnesses at Derrington's trial, on the defense theories he presented to the jury, on his pretrial investigation, or on his trial performance. See note 11, *supra.* On the other hand, Wood did not attempt to negotiate more favorable treatment for Derrington, nor did he counsel Derrington regarding the options that might be available to him if he cooperated with the prosecutors. The critical question is why a potential strategy, which was obvious to Wood both in 1992 and in 1995, was never pursued. The sequence of events in this case, and Wood's own testimony, permit only a single inference, namely, that Wood's inaction resulted from his conflicting representations. Indeed, there is no other explanation in this record for Wood's failure to do that which he recognized Derrington's attorney should have done. We therefore conclude that Wood's representation of Taylor adversely affected his performance.

When Wood first learned about the conflict of interest, he warned the status judge that Derrington's attorney should be in a position to use Derrington's informant status as a "bargaining chip" in plea negotiations with the government. Wood stated that, if Derrington was the informant, then Wood would have to withdraw, because his representation of Taylor precluded him from so bargaining on Derrington's behalf. After Wood decided not to withdraw, he failed to approach the prosecutors to obtain a beneficial resolution of Derrington's pending cases, and he did not discuss with Derrington the possibility that his cooperation might secure more lenient treatment. Wood admitted at the hearing that he "didn't explore with the United States Attorney's Office whether or not they were willing to offer Mr. Derrington a plea bargain or a better resolution of these cases if he was willing to testify in the R Street Crew [case]." Wood's failure to take on Derrington's behalf the steps which Wood had previously told the status judge needed to be taken vindicates Wood's initial assessment— a conflict of interest inhibited him from pursuing what he knew to be the correct strategy.

This conclusion is bolstered by Wood's forthright testimony at the Section 23–110 hearing.[18] He stated that he perhaps should have withdrawn as Derrington's attorney. He testified that, "if the circumstances had been different, maybe Mr. Derrington should have been persuaded ... to testify in the R Street case." Wood admitted that, "in retrospect, maybe" he should have approached the United States Attorney's Office in an effort to obtain more favorable treatment for Derrington. He also acknowledged that "maybe [Derrington] should have been told to testify against them all," and that this "obvious" option should have been, but was not, explored with Derrington.

We recognize that many of Wood's comments were made "in retrospect," after Wood had lost the case and Derrington had been convicted. We must also heed the Supreme Court's admonition that "every effort be made to eliminate the distorting effects of hindsight." *Strickland, supra,* 466 U.S. at 689, 104 S.Ct. at 2065. Here, however, Wood foresaw in October 1992 many of the very problems which he identified "in retrospect" more than two years later. In light of Wood's statements to the status judge and his subsequent testimony at the Section 23–110 hearing, the record provides no rational explanation, other than a conflict of interest, for Wood's failure either to discuss with Derrington his option to cooperate with the prosecutors or to approach the prosecutors on Derrington's behalf.

The government argues that the dual representation had no adverse effect on Wood's performance because there was no prospect of a beneficial resolution of Derrington's pending cases. According to the government, the prosecutors were not likely to give Derrington a better plea offer, and Derrington himself wanted to go to trial rather than to plead guilty. However, the government's after-the-fact speculation that Derrington would not have cooperated with the prosecutors, and that, in any event, the prosecutors would not have been willing to offer Derrington a more favorable plea arrangement, is not dispositive. Under *Cuyler,* Derrington is not required to establish that his attorney's performance actually prejudiced the outcome of his trial. 446 U.S. at 349–50, 100 S.Ct. at 1718–19. He need not even show a "reasonable probability" that he would have been willing to cooperate, or that the prosecutors would have afforded him more lenient treatment in exchange for such cooperation. *Compare Strickland, supra,* 466 U.S. at 694, 104 S.Ct. at 2068.[19] Rather, Derrington is required to demonstrate only that the conflict of interest "actually affected the adequacy of his representation," *Cuyler, supra,* 446 U.S. at 349, 100 S.Ct. at 1719, and that the strategy which Wood failed to pursue was "plausible." *Fitzgerald, supra,* 530 A.2d at 1138. He has shown both.

Furthermore, Derrington's expressed unwillingness to plead guilty—under the circumstances of this case—is not dispositive. Wood himself admitted that

> maybe [Mr. Derrington] should have been told to testify against [the R Street Crew].... That obviously would have been an option for Mr. Derrington.... [I]f the circumstances had been different, maybe Mr. Derrington should have been persuaded, I'm not saying he would have wanted to, to testify in the R Street case. I didn't explore [that] with Mr. Derrington.... What I'm saying is that, in retrospect, maybe that should have been done.

---

18. We note that, in the best traditions of the bar, Wood testified with great candor at the Section 23–110 hearing, obviously attempting to promote justice notwithstanding any potential embarrassment to himself. His forthrightness in a difficult situation is to be commended.

19. *Burger v. Kemp,* 483 U.S. 776, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987), is not to the contrary. In *Burger,* the Court concluded that the asserted conflict of interest did not harm the attorney's advocacy, and observed that "[t]he notion that the prosecutor would have been receptive to a plea bargain is completely unsupported in the record." *Id.* at 785, 107 S.Ct. at 3121. In *Burger,* however, the district court had found that the attorney "constantly attempted to plea bargain with the prosecutor, but was rebuffed." *Id.* at 786, 107 S.Ct. at 3121 (internal quotation marks omitted). There was no question in *Burger*—as there is in this case—whether the attorney's failure to engage in plea negotiations in the first place was the result of his conflict of interest.

(Emphasis added). . Derrington was entitled to an attorney who would dispense advice according to the client's best interests, even if Derrington, without the benefit of such advice, previously had been opposed to the particular strategy which, in Wood's opinion, offered the best chance of success. *See Gee v. State,* 93 Md.App. 240, 611 A.2d 1081, 1090 (1992).[20] If it was in Derrington's best interest to approach the prosecutors and to offer Derrington's testimony against the R Street Crew in exchange for more favorable treatment, then that is what Wood should have advised. Moreover, even if Derrington had refused to plead guilty in the instant case under any circumstances, the strategy of attempting to enter into plea negotiations with the government may nevertheless have been viable. Derrington had another pending case, and if he possessed valuable information about the R Street Crew, Wood could have pursued a disposition which did not require Derrington to plead guilty to the present charges.[21]

The government also contends that Wood's representation of Taylor did not adversely affect Wood's performance because Derrington denied being an informant in the R Street Crew case. We reject this contention for several reasons. First, Derrington testified that, although he initially denied being an informant, he acknowledged the contrary to Wood at some point prior to his trial. Wood did not deny that Derrington made this admission. Second, Wood's contact with prosecutor Duncan between the two status hearings apparently revealed to Wood that, in the words of Duncan's affidavit, Derrington was the "source" for a search warrant for the home of one of the R Street defendants.

Wood's conversation with Duncan therefore conclusively refuted Derrington's assertion that he was not an informant. Finally, one predictable consequence of Wood's representation of Taylor, and Derrington's knowledge of that representation, would be to inhibit Derrington from being candid with Wood, especially regarding Derrington's activities as an informant, for fear of reprisal from the R Street Crew.

Wood warned the status judge that Derrington would need his attorney to "use as a bargaining chip" Derrington's past and potential cooperation with the police. That strategy was not pursued, and Wood later testified that it should have been. Wood thus "fore[went] efforts he would ordinarily [have] undertake[n] on behalf of one client, in order that the other client [would] not thereby be harmed." *Fitzgerald, supra,* 530 A.2d at 1133. We therefore hold that Wood's actual conflict of interest adversely affected his performance and deprived Derrington of the effective assistance of counsel which is guaranteed to him by the Sixth Amendment.

### 3. *Waiver.*

 Our dissenting colleague is troubled by Derrington's own failure to ask the trial judge for a new attorney. That failure, however, is not fatal to Derrington's conflict of interest claim. On the contrary, the *Cuyler* test applies specifically to cases where the defendant "raised no objection at trial." *Cuyler, supra,* 446 U.S. at 348, 100 S.Ct. at 1718.

More fundamentally, to affirm because Derrington did not personally object in the trial court would effectively penalize him for

---

**20.** In *Gee,* the court stated:

When still debating within himself as to whether to make such a bargain, [the appellant] was entitled to the best advice and wise experience of single-minded counsel. Notwithstanding [the appellant's] tentative decision to stand by his co-defendant, a lawyer concerned only with [the appellant's] temporal welfare would have read him the riot act, expatiated at length upon the folly of misguided loyalty, and persuaded him to take the "deal" and run. [The appellant's] lawyer, because of his mutual allegiance to [the co-defendant], however, was obviously paralyzed from giving such tactically sound advice. It was in

the very failure to receive such advice that [the appellant] was deprived of effective assistance. *Id.* Likewise, when Derrington was "still debating within himself" whether to go to trial, he was "entitled to the best advice and wise experience of single-minded counsel."

**21.** Derrington suggests, for example, that "Mr. Wood could have proposed that the government dismiss this case in exchange for a guilty plea in [Derrington's] other pending case or a reduced charge in that pending case, or [dismiss] both cases in exchange for ... cooperation in the R Street case."

not having unconflicted counsel. When Derrington did obtain an attorney without a conflict of interest, his objection to Wood's representation of him was promptly articulated. If conflict-free counsel had been available to Derrington in the trial court, then his present claim might very well have been asserted then.

Moreover, we have stated that a defendant cannot be said to have waived his right to conflict-free counsel unless the trial court has conducted

> an inquiry sufficient to establish that the defendant is aware of the right to conflict-free representation; understands the nature of the risks and the potential adverse effects of foregoing that right; and knows that, if convicted, he or she will not be able to complain on appeal that the defense at trial was compromised by the conflict.... Moreover, the informed and voluntary character of the waiver should be manifested by clear, unequivocal, and unambiguous language.

*Douglas, supra,* 488 A.2d at 138–39 (citations and internal quotation marks omitted). In this case, the status judge conducted no such inquiry. He merely informed Derrington at the first status hearing that, *if* Wood was unable to represent him, Derrington would be given an opportunity to retain another attorney. At the follow-up hearing, the judge accepted Wood's representation that no conflict of interest existed, stating: "That's good enough for me.... [A]s far as I'm concerned that is between you and your client, I see no reason to inquire further." Derrington later testified at the Section 23–110 hearing that Wood told him that the status judge would not allow him any additional time to obtain new counsel. Derrington also stated that he acquiesced in Wood's continued representation of him because Wood refused to refund his money, and because he did not want to proceed to trial with appointed counsel. Under these circumstances, Derrington cannot be said to have voluntarily and knowingly waived his right to conflict-free counsel.

## III.

### CONCLUSION

For the foregoing reasons, Derrington's convictions are reversed, and the case is remanded for a new trial.

*So ordered.*[22]

PRYOR, Senior Judge, dissenting:

The essence of appellant's challenge is that his conviction of narcotics offenses should be vacated because his trial attorney had a conflict of interest while representing him. The conflict, it is urged, stemmed from the representation of another person in a different prosecution which hampered counsel's advocacy in this case. Although the contention has some appeal, I am not persuaded, partly because of appellant's own inaction.

As the majority opinion explains more fully, appellant was charged with narcotics offenses in the Superior Court. At a status hearing before trial, appellant's trial counsel, on his own initiative, raised the question of a conflict of interest. In the District Court, he had represented a person charged with an unrelated offense, reputed to be a member of the R Street Crew. During the course of hearings in the District Court involving a search warrant related to the R Street Crew, it was represented that appellant had served as an informant for the government. The trial judge explained the nature of the concern to appellant and pointed out that he was delaying the status call to allow consideration of whether there should be a change of attorneys. Appellant, aware of the problem, raised no objection at that time. At a second status hearing, counsel, having investigated the matter, stated that he thought there was no conflict. Appellant again expressed no concern. Later a jury found appellant guilty of the offenses. Afterwards, appellant wrote to the trial judge alleging, for the first time, that his attorney had a conflict of interest. The denial of collateral relief on this ground is the primary focus of this appeal.

It is true, as has been stated, that we are now faced with the very question which coun-

---

**22.** We do not reach Derrington's *Strickland* claims. On retrial, however, the testimony of Ricky Monroe, the man who wrote to the judge

that he committed the crime and that Derrington did not, may well be available to the defense.

sel raised at that early status hearing. Indeed, appellant's trial counsel was straightforward and consistent in his analysis of his responsibilities regarding plea negotiations and the trial itself. What has changed, of course, is appellant's earlier inaction and his assertions after the jury's verdict.

At the 23–110 hearing, it was offered that the plea to the other offense by the other defendant in District Court was concluded before counsel began representing appellant; that appellant was not an informant against the other defendant; and that the search warrant did not pertain to the defendant who pleaded guilty. Appellant's trial counsel was examined extensively regarding the performance of his duties in the conduct of appellant's defense in the trial court. It was shown that appellant had consistently demanded a trial. Counsel stated that, given the post-conviction allegations, he possibly should have attempted "to persuade" appellant to consider alternatives other than trial. Lastly, appellant testified, among other things, that he did not trust his attorney.

The trial judge, having reviewed all of the evidence, and relying primarily on *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and related decisions, concluded there was no actual conflict of interests and no ineffective assistance of counsel.

The *Cuyler* decision reinforces the basic tenet that an accused is entitled to an advocate who is dedicated solely to the interests of the accused. In questions of this kind, there is some degree of restraint imposed upon trial judges and lawyers in recognition of the secrecy and confidentiality which flows between client and counsel. Thus, judges must be alert to problems, but yet can not reasonably inquire broadly and aggressively at every turn. *Cuyler*, 446 U.S. at 346–47, 100 S.Ct. at 1717–18. Ultimately, the judge is looking for an actual conflict of interest which will substantially affect the representation of the client.

Decisions in this subject area contemplate that an accused must give some signal to the court, if facts known to the accused create a possible or likely conflict in the representa-tion. It is certain that the lawyers involved have a similar obligation. Again, the judicial response in this area must take into account the relationship between attorney and client as well as the circumstances which become known to the court, either as volunteered or in response to inquiry.

In appellate review of issues of this kind, we are cautioned "... to eliminate the distorting effects of hindsight ...," *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, and that is certainly an important factor in this instance. It is inescapable that the questions which were the focus of a series of trial court hearings could readily have been resolved by appellant himself. He knew from the beginning the nature of the problem. Indeed, he was advised before trial that he could obtain new counsel. The attorneys for both sides, and the judge, were in accord. Belatedly, after conviction, this claim was made. Thus, in my view, it must be said that appellant's attorney, counsel for the government, and the trial judge, reacted appropriately to information known to them at the time. Quite simply, appellant is the only person who knew whether, under the circumstances, he wanted a different attorney. He chose to remain silent until after the trial.

On balance, I conclude there was no error and would affirm the denial of request for a new trial.