**Kevin A. McCRIMMON, Appellant,**

v.

**UNITED STATES, Appellee.**

No. 95–CF–802, 98–CO–1259, 99–CO–1654.

District of Columbia Court of Appeals.

Argued June 5, 2001.

Decided July 8, 2004.

Matthew W. Greene, Fairfax, VA, appointed by the court, for appellant.

Steven B. Snyder, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, Elizabeth Trosman, and Heidi M. Pasichow, Assistant United States Attorneys, were on the brief, for appellee.

Before FARRELL, RUIZ and WASHINGTON, Associate Judges.

RUIZ, Associate J.

■ The key issue in this appeal is whether, as a result of a discussion between defense counsel and a crucial prosecution witness over a tentative attorney-client relationship, appellant's appointed counsel operated under an "actual conflict" in violation of the Sixth Amendment right to effective assistance of counsel as established in *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In *Cuyler,* the Supreme Court held that "a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id.* at 350, 100 S.Ct. 1708. To demonstrate an actual conflict, the appellant must "point to specific instances in the record to suggest an actual conflict or impairment of his or her interests," and show that the "alleged conflict of interest ... obstructs the use of a particular strategy or defense ... [that is] plausible." *Derrington v. United States,* 681 A.2d 1125, 1133 (D.C.1996) (quoting *Fitzgerald v. United States,* 530 A.2d 1129, 1138 (D.C.

1987)). Where there is an actual conflict, the defendant "need not demonstrate prejudice in order to obtain relief." *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. 1708. Although McCrimmon has not, as of yet, met the *Cuyler* standard, he has presented enough facts to merit an evidentiary hearing before the trial court.

## I.

### Background

The alleged conflict of interest in this case would arise from a preliminary conversation between McCrimmon's attorney and Antonio Murphy, a witness the government said was "crucial" to its case against McCrimmon.[1] Both the prosecutor and the defense attorney had information about this conversation, which they presented to the court separately in *ex parte* hearings at the beginning of the trial when the government disclosed that it would be presenting Murphy as a witness.

The defense attorney, Bernard Grimm, informed the court that Murphy had sought Grimm's representation in connection with unrelated charges involving possession of a gun and cocaine. Murphy told Grimm that his fee would be paid by a third party, who Grimm believed to be a friend or relation of McCrimmon.[2] That person later contacted Grimm to say that he would not pay for the representation. When Grimm repeated the comment to Murphy, he became "very irritated and said [']well, if he's going to be like that we'll see—if he wants to play like that, let's see what happens[,']" or words to that effect." Grimm claimed that he was unaware at the time—in fact, not until trial—that Murphy was involved in the crime charged in McCrimmon's case, although Murphy had off-handedly asked Grimm about McCrimmon, and Grimm had replied that McCrimmon was involved in the shooting underlying this appeal. See note 1, *supra*.[3]

1. The underlying case involved an alleged agreement between McCrimmon and William Napper to exchange murder victims: in return for Napper killing a man who supposedly robbed and beat McCrimmon, the latter would murder a man for Napper. McCrimmon, at Napper's request, supplied guns and a car for Napper and his associates, and stored the weapons at the home of Antonio Murphy. Murphy's testimony showed that McCrimmon gave the weapons to Napper and the others and that he saw McCrimmon help destroy the automobile used by the killers. The jury convicted McCrimmon of: second-degree murder while armed (as an aider and abettor to an unpremeditated killing), *see* D.C.Code §§ 22–2401, –3202 (1989); conspiracy to commit assault and murder, *see* D.C.Code §§ 22–105(a), –501, –2401, –3202 (1989); four counts of assault with intent to kill while armed (as an aider and abettor), *see* D.C.Code §§ 22–501, –3202; and tampering with evidence. *See* D.C.Code § 22–723 (1989). McCrimmon, who was 17 years old at the time the crimes were committed, received stiff consecutive sentences aggregating to mandatory 25 years' minimum up to life

imprisonment. When ordering him held pretrial without bond, the trial judge commented that McCrimmon had "a violent and dangerous history" since he was 13 years old, that his probation in a drug case had been revoked, and that he had been arrested for possessing a machine gun.

2. Grimm told the trial judge "the person [who] was going to make a down payment on the fee is maybe related to Mr. McCrimmon. If they're not kin, they're very close." At oral argument on appeal, McCrimmon's attorney stated that either McCrimmon or someone close to him had promised to pay Murphy's legal bills. Although there is no support in the record that McCrimmon himself promised to pay Murphy's bills—in fact, Grimm explicitly excluded that possibility—there is support in the record for the proposition that the third party is associated with McCrimmon.

3. According to Grimm, "[Murphy] referred to [McCrimmon] as a young'un and asked me what he was caught up in and I told him it was the O Street case without telling him more."

In a separate *ex parte* hearing, the prosecutor revealed that Murphy was indeed angry with McCrimmon and upset that his friends would not pay for his lawyer. Murphy told the government that although he did not contact Grimm directly, a person named Jimmy Robinson "would get [Murphy] a lawyer and that [Robinson] would pay for [that] lawyer." Murphy believed that "he would get Mr. Grimm [as his attorney] and Kevin McCrimmon would get Mark Rochon." Murphy also believed that McCrimmon had "snitched" on him, telling police there was a gun and drugs at his house, and was angry over the others' failure to pay for his counsel "because they kind of left him sitting in jail."

After the *ex parte* hearings, the trial court found that McCrimmon knew of Murphy's frustration over not receiving the representation he had expected and

agreed to Grimm's continuing representation.[4] The trial court also determined that Grimm's conversations with Murphy were covered by the attorney-client privilege, but that Murphy had waived that privilege by admitting his guilt in a plea bargain.[5] The trial court commented that Grimm "ought" to cross-examine Murphy with respect to his supposed bias against McCrimmon for not paying (or not allowing his associate or relative to pay) for Grimm to act as Murphy's lawyer.[6]

During trial, however, Grimm did not cross-examine Murphy about whether he was motivated to testify against McCrimmon because the anticipated payment for Grimm's representation in his own trial had not materialized. Instead, Grimm impeached Murphy on a number of other issues, including his anger against McCrimmon for "snitching." [7]

---

4. The trial court did not question McCrimmon directly. According to Grimm, after he explained the situation to McCrimmon in "layman's terms," McCrimmon asked him to continue the representation, saying "if you feel comfortable, then I feel comfortable."

5. The trial court stated:

> I have resolved the issue this way. It seems to me[,] based upon the witness'[s] admitted involvement in both the case in which he apparently at one point was on trial, and the admissions he will make with respect to his complicity here, resolve in my mind any restrictions Mr. Grimm might have on his ability to fully cross-examine him.
>
> To the extent that the person may have made statements even ... preliminarily to hiring Mr. Grimm, or an attempt to hire Mr. Grimm, and that individual has now admitted his criminal involvement, any statements no longer would be confidential.

The trial court later stated that "to the extent there was a privileged confidential communication, it's no longer privileged or confidential."

6. The trial court stated:

> The only ... issue I can disclose that we talked about ..., and Mr. Grimm ought to pursue this, [is] that perhaps this witness

was upset that Mr. Grimm didn't represent him after hoping that Mr. Grimm might at one point and maybe that's a reason why he wants to testify against Mr. McCrimmon. Mr. Grimm can ask him those questions.

7. Grimm questioned Murphy for bias against McCrimmon as follows:

> [Grimm] And then you heard that Mr. Mc[C]rimmon said that you were involved in O Street and that got you mad; right?
> [Murphy] No, it didn't get me mad. I was just—
> ...
> [Grimm] You decided to turn the table on him; right?
> [Murphy] Well, I'm only doing what I think is right.
> [Grimm] You're doing what you think is right. What's right is—What's good for you; right?
> [Murphy] Yes.

Murphy was also impeached with the fact that he was in prison awaiting sentencing after he pled and that he could benefit from his collaboration with the government, including his trial testimony against McCrimmon. He was further impeached with prior convictions, inconsistencies in his testimony, and his drug addiction.

## II.

### Procedural Posture

Appellant filed two motions (both appealed and presently before us) under D.C.Code § 23–110 (1996). The first motion was filed by appointed appellate counsel and requested a new trial based on claimed ineffective assistance of counsel (on grounds other than conflict of interest) as well as the recantation of a government witness. After the trial court denied that motion without a hearing, counsel sought permission from this court to withdraw from the case.[8] New appointed appellate counsel filed a second § 23–110 motion making a different claim of ineffectiveness of trial counsel based on the conflict of interest raised by the trial record and requesting a hearing.[9] The trial judge denied the second motion without a hearing on the ground that it was a "second or successive motion." See D.C.Code § 23–110(e) (providing that the trial court need not entertain "a second or successive motion for similar relief").[10]

The second motion was not "successive" because it raised a new claim. See McCleskey v. Zant, 499 U.S. 467, 487, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991) (explaining that a "successive" motion is one that raises a claim identical to that contained in a previous motion); Junior v. United States, 634 A.2d 411, 417 n. 15 (D.C.1993) (stating that a successive motion is identical to the first motion). As a "second" motion, it could nonetheless be properly denied as procedurally barred as an "abuse of the writ," unless there was cause for the delay and prejudice resulting from failure to consider the motion. See Junior, 634 A.2d at 417 n. 15; Head v. United States, 489 A.2d 450, 451 (D.C. 1985). Ineffective assistance of counsel will constitute "cause" if counsel was constitutionally required. See Murray v. Carrier, 477 U.S. 478, 494, 106 S.Ct. 2639 (1986). Although the Constitution does not guarantee the right to counsel on "collateral attack," see Coleman v. Thompson, 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), our judicial policy, which generally requires appellate counsel to file known claims of ineffective assistance of trial counsel during the pendency of the direct appeal and consolidate the appeals for review, treats such post-conviction proceedings as part and parcel of the appeal to which appellant is entitled and, correspondingly, extends the obligations of appellate counsel. See Shepard v. United States, 533 A.2d 1278, 1280 (D.C.1987). We need not finally resolve in this case whether those extended obligations of counsel appointed for direct appeal implicate the constitutional right to counsel on

8. Although the denial of the first § 23–110 motion was appealed (No. 98–CO–1259), appellant does not make any argument concerning it in his briefs and we therefore consider that the appeal has been abandoned.

9. The motion attached a transcript of the relevant trial court proceedings and directed the court to specific portions of the transcript that raised the conflicts question.

10. In the words of the trial court:

What Mr. McCrimmon is attempting to accomplish with this second § 23–110 motion is to fix a defective direct appeal. "Section 23–110 is not designed to be a substitute for direct review .... Relief under § 23–110 is appropriate only for serious defects in the trial which were not correct[a]ble on direct appeal or which appellant was prevented by exceptional circumstances from raising on direct appeal." Head v. United States, 489 A.2d 450, 451 (D.C.1985). Mr. McCrimmon has not presented to this court any exceptional circumstances. The Court of Appeals could address the faults of the direct appeal after it has ruled on the appeal and then Mr. McCrimmon files a motion to recall mandate.

direct appeal under *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). *See Williams v. United States,* 783 A.2d 598, 604 (D.C.2001) (en banc); *id.* at 604 (Ruiz, J., concurring) (citing *Thomas v. United States,* 772 A.2d 818, 829–30 (D.C.2001) (Ruiz, J., dissenting in part)); *id.* at 605 (Glickman, J., concurring).[11] In *Williams,* we held that appellate counsel who does not file a timely appeal of the denial of a § 23–110 motion fails in his obligations under the Criminal Justice Act, and entitles appellant to relief so as to avoid a procedural default. *See id.* at 601. We "reserv[ed] for another case the issue of which rights, if any, a defendant may have with respect to appellate counsel's *conduct* of the hearing on a claim of ineffectiveness made in accordance with *Shepard."* *Id.* at 600 n. 1. This case raises the issue of first appellate counsel's deficient conduct in failing to raise the conflicts issue in the first § 23–110 motion. We have no doubt that the filing of a § 23–110 motion claiming ineffectiveness of trial counsel due to a possible conflict reflected in the trial court record and requesting a hearing that would supplement the claim made in the § 23–110 motion (and, in this case, also in the direct appeal) is an integral part of appellate counsel's statutory obligation to represent a defendant "through appeals, *including ancillary matters appropriate to the proceeding."* D.C.Code § 11–2603 (2001)

(emphasis added).[12] That statutory obligation is confirmed by the rule in *Shepard,* which directs counsel to use § 23–110 as a procedural vehicle ancillary to the direct appeal: it is "a means of making a record regarding matters relevant to the ineffectiveness claim that do not appear in the record on the case on appeal." *Shepard,* 533 A.2d at 1280. As we later discuss, the trial record in this case raises questions about a possible conflict that cannot be answered within the four corners of the record on direct appeal. Thus, appellate counsel was required by statute to pursue and, per our guidance in *Shepard,* to file during the pendency of the direct appeal[13] a § 23–110 motion requesting a hearing.

■ Although we require separate notices of appeal from the conviction and denial of the § 23–110 motion, the case is before us for the first time as a unitary whole. A hearing on the second motion would have permitted appellant to supplement the record with facts that would have established—or ruled out—whether there was a conflict of interest. Unlike the jurisdictional obstacle hurdled in *Williams,* "the procedural default rule is neither a statutory nor a constitutional requirement, but it is a doctrine adhered to by the courts to conserve judicial resources and to respect the law's important interest in the finality of judgments." *Massaro v. United States,* 538 U.S. 500, 503, 123 S.Ct.

11. The government's brief arguing to the contrary was filed before our *en banc* decision in the *Williams* case and relied on the division opinion we overruled.

12. We have outlined the scope of appellate counsel's duty as including 1) "investigat[ing] possible ineffective assistance of counsel claims ... triggered by ... what is reasonably noticeable from the trial court's records," 2) "researching and developing points thus uncovered," 3) advising appellant if counsel believes there is an "adequate basis for advancing" a claim of ineffective assistance of trial

counsel, 4) requesting appointment of counsel for the § 23–110 motion, and 5) either filing or assisting appellant in preparing and filing the motion. *Doe v. United States,* 583 A.2d 670, 674–75 (D.C.1990).

13. Appellate counsel also asked that the direct appeal be held in abeyance and the appeals consolidated. As we noted in *Williams,* counsel is not required to stay the direct appeal if, in counsel's opinion, it would unduly delay resolution of meritorious issues on direct appeal. *See* 783 A.2d at 602 n. 4.

1690, 155 L.Ed.2d 714 (2003). Until the case has run its appellate course, however, there is no final judgment to protect through application of the procedural default rule. Therefore, although it would be preferable for counsel to bring all known ineffectiveness claims to the trial court in a single motion during the pendency of the direct appeal, to procedurally bar a second motion filed while the appeal is still pending undermines the procedure we have established to facilitate the presentation of claims of ineffective assistance of counsel on a fully-developed record which enables "this court to conserve its time and effort by deciding the entire case in a single proceeding." *Washington v. United States,* 834 A.2d 899, 906 (D.C.2003) (holding that the *Shepard* rule is fully consistent with *Massaro* ). *Cf. Matos v. United States,* 631 A.2d 28, 30 (D.C.1993) (holding that a § 23–110 motion claiming ineffective assistance of counsel was procedurally barred because it was not filed during pendency of direct appeal and no cause or prejudice was shown for failure to do so).[14] Moreover, we are aware that if the second § 23–110 motion were procedurally barred, a request to recall the mandate due to the ineffectiveness of the appellate counsel who filed the first § 23–110 motion probably would require referral to the trial court for a hearing. *See Williams,* 783 A.2d at 603 n. 5 (citing *Watson v. United States,* 536 A.2d 1056, 1061 (D.C.1987) (en banc)).

We conclude, therefore, that the failure of first appointed counsel on appeal to raise the conflict issue did not bar appellant from presenting it in his second § 23–110 motion. We have no occasion to decide here whether, in an appropriate case, excessive filings, undue delay, and prejudice to the other party may be factored into the trial court's consideration even if the appeal has not been decided. In this case, no proper reason has been advanced—and we do not perceive one in the record—for the denial of the motion without reaching the merits.

■ We now turn to address prejudice, both in the context of "cause and prejudice" and as an integral part of the claim of ineffectiveness of counsel. Prejudice sufficient to satisfy "cause and prejudice" is shown if the defendant would have been entitled to relief, in this case, for ineffectiveness of trial counsel. An ineffectiveness claim grounded on conflict of interest is not judged by *Strickland's* prejudice prong—*i.e.,* a reasonable probability that but for counsel's errors, the outcome would have been different—but by a more lenient standard: whether the conflict had an impact on a "plausible" defense strategy. *See Derrington,* 681 A.2d at 1133 (citing *Chase v. United States,* 656 A.2d 1151, 1154 & n. 7 (D.C.1995)); *see also Mickens v. Virginia,* 535 U.S. 162, 175–76, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002) (questioning—but leaving undecided—whether *Cuyler's* rule of presumed prejudice should apply to cases of successive representation rather than "multiple concurrent representation"). Our review of the record leads us to conclude that, if Grimm held back during cross-examination because of his prior relationship with Murphy, it could have had an impact.

In cross-examining Murphy, Grimm attempted to impeach him primarily for bias

---

**14.** We do not consider that we are bound by the court's suggestion to the contrary in *Thomas,* 772 A.2d at 824. The statement was arguably dictum, as the court decided that the motion filed in that case provided no support for the allegations of ineffective assistance of counsel. And importantly, *Thomas* was decided before our *en banc* decision in *Williams,* where the statutory obligations of counsel appointed for direct appeal, including the duty to investigate and raise legitimate claims of ineffective assistance of counsel, were in the foreground of our discussion.

in favor of the government because of a desire to curry favor with the prosecutor pending sentencing on his guilty plea. As far as bias against McCrimmon, Grimm brought up that McCrimmon had told police that Murphy had guns and drugs in his house. Grimm also generally impeached Murphy with prior convictions, inconsistencies in his testimony, and a longstanding drug addiction. Notwithstanding this broad-based impeachment, however, Murphy maintained that McCrimmon—who was not involved in the actual shooting—was instrumental in providing all of the weapons that were used by the shooters. Without Murphy's testimony, the evidence would have been sufficient to convict McCrimmon as a conspirator and an aider and abettor, but it would have been less compelling.[15] The government conceded as much when the prosecutor characterized Murphy as a "crucial" witness.[16] So the question becomes whether additional impeachment of Murphy for bias against McCrimmon because Murphy held McCrimmon responsible for foiling Murphy's expectation that Grimm would represent him would have had an impact on the defense strategy of undermining Murphy's testimony against McCrimmon. Although the transcript of Murphy's cross-examination shows that he was impeached with his pending sentencing and drug addiction, the additional impeachment for bias could have made a difference in pointing out that Murphy had a reason to lie not only to help himself, but in order to get back at McCrimmon. The questioning on Murphy's animus against McCrimmon was relatively minor in comparison with the other points of impeachment. Murphy deflected the charge that he was incriminating McCrimmon because he was mad at him for "snitching." See note 7, *supra*. If Grimm had brought up the issue that Murphy was angry because McCrimmon would not assist Murphy retain Grimm as his lawyer, he would have been able to use Murphy's own words ("if he wants to play like that, let's see what happens") to show the jury the intensity of Murphy's discontent. The importance to Murphy of having Grimm's representation could have been driven home to a jury that had observed Grimm's in-court performance defending McCrimmon, as compared to the frustrated Murphy who pled guilty because his attorney had told him he faced an "uphill battle."

### III.

### *The Potential Conflict*

 We agree with the trial court that any attorney-client privilege Murphy

---

**15.** Garcia Hill, one of the participants in the shooting, testified that a day or two before the shooting he had overheard McCrimmon and Napper plan the shooting. See note 1, *supra*. He also testified that on the day of the shooting, McCrimmon assisted in obtaining a car and gave Hill a loaded Taurus 9 millimeter gun and told him how to use it. McCrimmon also directed Hill and the other participants to Murphy's home to get more guns, and, after the shooting, accompanied the person who was going to blow up the stolen car used by the shooters. However, Hill was heavily impeached for bias in favor of the government in light of his favorable plea bargain with the government. He also was exposed as having lied to the judge during his plea colloquy and was impeached with his pending sentencing and drug addiction, the additional impeachment for bias could have made a difference in pointing out that Murphy had a reason to lie not only to help himself, but in order to get back at McCrimmon. The questioning on Murphy's animus against McCrimmon was relatively minor in comparison with the other points of impeachment. Murphy deflected the charge that he was incriminating McCrimmon because he was mad at him for "snitching." See note 7, *supra*. If Grimm had brought up the issue that Murphy was angry because McCrimmon would not assist Murphy retain Grimm as his lawyer, he would have to the police when he acknowledged his participation in the shooting, but did not mention that McCrimmon was also involved.

**16.** Murphy testified that two days before the shooting McCrimmon had given him a duffle bag with four guns and an AK–47 rifle and asked Murphy to hold them. On the day of the shooting, according to Murphy, McCrimmon asked for the guns and then gave them to the gunmen just before they took off in the car to the O Street market where the shooting took place. Murphy testified that McCrimmon told him to "watch his work"—which Murphy understood to mean that someone was going to be killed.

might have with Grimm concerning the underlying crime was waived by Murphy's plea. Moreover, Murphy himself had disclosed to the prosecutor that he was mad at McCrimmon for snitching and angry that his representation had not come through as he expected.[17] *See Bundy v. United States*, 422 A.2d 765, 767 (D.C. 1980). The ethical rules, however, would nonetheless preclude Grimm from cross-examining Murphy based on their conversation, even if he were not revealing privileged information. Rule of Professional Conduct 1.6 prohibits an attorney from using either a "confidence" or a "secret" against a client. A confidence is defined as information protected by the attorney-client privilege, whereas a "secret" is *"other information* gained in the professional relationship that the client has requested be held inviolate, or *the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client."* D.C. Rules of Prof'l Conduct R. 1.6(b) (emphasis added).[18] If Grimm were to

cross-examine Murphy about their private conversation, it would seem to be at least embarrassing to Murphy, and perhaps could even be seriously detrimental to him, if the examination succeeded in showing that Murphy perjured himself in his testimony against McCrimmon or that Murphy had been willing to "help" McCrimmon in his criminal prosecution in exchange for assistance in retaining the counsel he wanted.[19] *See Herbin v. Hoeffel*, 806 A.2d 186, 197 (D.C.2002); *see also In re Gonzalez*, 773 A.2d 1026, 1029–30 (D.C.2001) (stating that public allegations that the client "deliberatively lied" to his attorney is a "secret" within the meaning of a comparable Virginia rule of professional conduct because it could be "embarrassing" and "detrimental" to the client). In addition, Rule 1.7 prohibits a lawyer from representing a client in a matter in which the lawyer's judgment may be affected by duties to other parties without the client's consent.[20] It is axiomatic that the validity

---

17. Murphy's disclosures to the prosecutor moot appellant's argument that Murphy's plea did not cover all aspects of his conversations with Grimm.

18. Rule 1.6(b) states in relevant part:
 (a) Except when permitted under paragraph (c) or (d), a lawyer shall not knowingly:
 (1) Reveal a confidence or secret of the lawyer's client;
 (2) Use a confidence or secret of the lawyer's client to the disadvantage of the client;
 (3) Use a confidence or secret of the lawyer's client for the advantage of the lawyer or of a third person.
 (b) "Confidence" refers to information protected by the attorney-client privilege under applicable law, and "secret" refers to other information gained in the professional relationship that the client has requested be held inviolate, or the disclosure of which would be embarrassing, or would be likely to be detrimental, to the client.

19. The government contends that Grimm was ethically able to reveal any "secrets" gained

in his conversation with Murphy because the rules allow such revelation when "required by law or court order," *see* D.C. Rules of Prof'l Conduct R. 1.6(b)(d)(2)(A), and the trial court's statement that Grimm "ought" to question Murphy about his legal representation constituted a court order. We doubt that the judge intended his comment to be construed as an "order." Moreover, as the government acknowledges, comment 26 to Rule 1.6 urges a lawyer who is ordered to disclose client confidences to resist and appeal. In the absence of a court order, a lawyer may not disclose one client's secrets in the service of another client without obtaining the former client's consent. *See* D.C. Rules of Prof'l Conduct R. 1.6(a)(3) & 1.7(c). Here there is no indication that Grimm sought and received Murphy's consent.

20. Rule 1.7 states in relevant part:
 (b) Except as permitted by paragraph (c) below, a lawyer shall not represent a client with respect to a matter if:
 . . .
 (4) The lawyer's professional judgment on behalf of the client will be or reasonably

of McCrimmon's consent to Grimm's representation is necessarily dependent on his understanding of Grimm's remaining ethical obligations to Murphy.

■ That a lawyer has violated a rule of professional conduct designed to preserve client confidences and avoid conflicts of interest does not necessarily equate to a disqualifying conflict requiring reversal for infringement of the Sixth Amendment right to counsel. *See Mickens*, 535 U.S. at 172–73, 122 S.Ct. 1237 (holding that reversal for conflict requires showing of effect on counsel's performance). The rules do provide guidance, however, and can shed light on counsel's perceived constraints. We have noted that the subjective belief of an attorney that a conflict is present, while not conclusive, is strong evidence of an actual conflict:

> The fact that [the attorney] believed that there was a conflict of interest, and acted as though there was a conflict, constitutes strong, if not conclusive, evidence that an actual conflict existed. This court has recognized that, in determining whether a trial judge properly denied a defense request for a continuance based on a possible conflict of interest, it is "significant" whether counsel "believed the potential for conflict was so real as to oblige him to seek leave to withdraw from the case."

*Derrington*, 681 A.2d at 1134–35 (quoting *Gibson v. United States*, 632 A.2d 1155, 1159 n. 14 (D.C.1993)). Counsel "is in the best position to determine when a conflict exists." *Mickens*, 535 U.S. at 167, 122

S.Ct. 1237 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 485–86, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978)). What McCrimmon and Murphy knew and what Grimm thought his ethical obligations were, are therefore essential to a determination of whether there was an actual conflict under *Cuyler*.

## IV.

### The Record on Appeal

We cannot resolve this matter—nor could the trial court—without knowing whether Grimm actually believed there was a conflict, or whether McCrimmon understood the nature of the conflict when he consented to Grimm's continuing representation. If Grimm had no such belief and had other reasons not to question Murphy about his failed representation, McCrimmon's appeal would fail because the alleged conflict would not have obstructed a plausible strategy or defense. *See Derrington*, 681 A.2d at 1133. If, on the other hand, Grimm did believe that he was constrained by Rule 1.6, he most likely acted under an actual conflict. *See id.* The evidence we now have is inconclusive on the issue of Grimm's belief. Although the court determined that Grimm could "with complete ethical propriety, represent Mr. McCrimmon and ... effectively cross-examine [Murphy]", it is odd that he did not pursue a line of questioning that the court said he "ought" to consider, particularly given that Murphy directly implicated McCrimmon in the shooting.[21] It is possible to read the transcript as indicat-

---

may be adversely affected by the lawyer's responsibilities to or interests in a third party or the lawyer's own financial, business, property, or personal interests.

(c) A lawyer may represent a client with respect to a matter in the circumstances described in paragraph (b) above if each potentially affected client provides consent to such representation after full disclosure

of the existence and nature of the possible conflict and the possible adverse consequences of such representation.

21. As previously noted, Murphy's plea did not release Grimm from the obligation not to disclose or use Murphy's "secrets." See text and accompanying notes 17–19, *supra*.

ing that defense counsel (and perhaps the prosecutor) had lingering doubts on the issue.[22] The government explains that Grimm had reason to avoid this line of questioning to prevent the jury from inferring that McCrimmon and Murphy (who the jury knew had pled to participating in the charged offense) were close associates. But this reasoning is weak at best. Even if the jury were to infer that McCrimmon and Murphy were close, that fact alone would have been much less damaging than the jury's crediting Murphy's testimony that McCrimmon prepared for and provided the guns immediately before the shooting. So the "critical question" remains, as in *Derrington,* "why a potential strategy, which was obvious[,] ... was never pursued." 681 A.2d at 1136.

Moreover, if Grimm's decision not to more fully cross-examine Murphy for bias was in any way affected by Grimm's perception of a continuing obligation to Murphy, McCrimmon's reliance on Grimm's judgment that he was "comfortable" continuing the representation would be undermined. In the absence of McCrimmon's informed acquiescence, the trial court would have to conduct an inquiry if there was a *"possibility* of a conflict" to ascertain appellant's knowledge and informed consent. *Witherspoon v. United States,* 557 A.2d 587, 590 (D.C.1989) (quoting *Douglas v. United States,* 488 A.2d 121, 136 (D.C.1985)). In determining whether "a potential conflict reaches the point at which disqualification is warranted," we have recently said that the trial court should " 'examine whether the subject matter of the first representation is substantially related to that of the second,' whether 'the conflict could cause the defense attorney improperly to use privileged communications in cross-examination,' and whether 'the conflict could deter the defense attorney from intense probing of the witness on cross-examination to protect privileged communications with the former client....' " *Pinkney v. United States,* 851 A.2d 479, 487, 2004 D.C.App. LEXIS 316, \*17 (2004) (quoting *United States v. Ross,* 33 F.3d 1507, 1523 (11th Cir.1994) (citations omitted)). The record raises—but does not answer—these questions. Thus, we disagree with appellant's contention that the substantive issue of the attorney's conflict can be decided on the present record.

 We reverse and remand to the trial court for an evidentiary hearing and findings of fact on the question of Grimm's actual belief on whether he was ethically constrained in cross-examining Murphy; its impact, if any, on McCrimmon's consent to his continued representation, and whether it affected the defensive strategy followed in cross-examining Murphy.[23]

*So ordered.*

---

**22.** After the trial judge stated that nothing had been brought to his attention that "causes ... any concern" about conflict of interest, the prosecutor interjected that she thought "that Mr. Grimm needs to understand the extent of the bias problem...." And after the trial court ruled that Grimm was free to engage Murphy in cross-examination, Grimm ambiguously commented: "That's not that great of a loss for him...."

We also note that toward the end of Murphy's cross-examination, the trial judge took a five-minute recess so that Grimm could organize a "litany" of additional questions he wanted to ask. After the recess, Grimm announced he had no further questions.

**23.** None of McCrimmon's other contentions (raised in a *pro se* supplemental brief) has merit, and we dispense with them summarily:

1) The trial court, as requested by the defense, properly instructed the jury that it must acquit McCrimmon of the greater crime of first degree murder before considering the lesser-included offense of second-degree murder. *See Wright v. United States*, 588 A.2d 260, 262 (D.C.1991) ("acquittal first" instruction is essentially a tactical decision with certain inherent advantages and disadvantages in which the defense should be granted some deference); *Brown v. United States*, 627 A.2d 499, 508 (D.C.1993) (holding that a defendant has no basis for an appeal of a jury instruction requested by the defendant at trial). 2) Although the government's primary theory was that McCrimmon helped plan and execute the murders, it also presented evidence that the killers had not planned to murder Duwan Avant specifically, but did so impulsively, when they arrived on the scene. This, in light of other evidence that McCrimmon obtained the guns used in the attack and handed the weapons to the shooters before they went to the market, is sufficient to support a theory that McCrimmon aided and abetted the impulsive killing of Avant. A second-degree murder instruction was therefore appropriate. *See Bright v. United States*, 698 A.2d 450, 458 (D.C.1997) ("homicides that are unplanned or impulsive, even though they are intentional and with malice aforethought, are murder in the second degree.") (quoting *Hall v. United States*, 454 A.2d 314, 317 (D.C.1982)). 3) The plea agreements with Hill and Murphy did not violate 18 U.S.C. § 201(c)(2) and cannot be considered to be prosecutorial misconduct. *See Boone v. United States*, 769 A.2d 811, 825 n. 15 (D.C.2001) (citing with approval the decision of the Tenth Circuit in *United States v. Singleton*, 165 F.3d 1297, 1302 (10th Cir. 1999), which held that "the longstanding practice of [exchanging] leniency for testimony" is not prohibited under 18 U.S.C. § 201(c)(2), and only concessions not normally granted by the government in exchange for testimony are prohibited). 4) McCrimmon contends, in essence, that the trial court should have granted a motion for judgment of acquittal because the testimony of the individuals with plea agreements is inherently incredible, and inferences from that testimony were therefore invalid. Because the pleas were disclosed to the jury and issues of witness credibility are left to the jury, *see Curry v. United States*, 520 A.2d 255, 263 (D.C.1987), the trial court did not err in denying the motion. 5) McCrimmon was found guilty of assault with intent to kill Antione Budd, Jerome Crawford, Rico Monroe and Andrew Paige, but was convicted of assault with a deadly weapon of a completely different set of victims: Veronica Scott, Viola Lett, and Diane Duckett. Because "[c]rimes do not merge if they are perpetrated against different victims," *Hanna v. United States*, 666 A.2d 845, 855 (D.C.1995), the convictions do not merge.