Kevin A. McCRIMMON, Appellant,

v.

UNITED STATES, Appellee.

No. 05–CO–1136.

District of Columbia Court of Appeals.

Argued Oct. 5, 2010.

Decided Sept. 1, 2011.

William G. Dansie, appointed by the court, for appellant.

Todd Gee, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Chrisellen R. Kolb, and Carolyn K. Kolben, Assistant United States Attorneys, were on the brief, for appellee.

Before WASHINGTON, Chief Judge, BLACKBURNE–RIGSBY, Associate Judge, and REID,* Associate Judge, Retired.

REID, Associate Judge, Retired:

In 2004, we considered appellant Kevin A. McCrimmon's appeal relating to the trial court's denial of his second D.C.Code § 23–110 (2001) motion. *McCrimmon v. United States,* 853 A.2d 154 (D.C.2004) (*McCrimmon I*). We said that "the key issue in th[e] appeal" was "whether, as a result of a discussion between defense counsel and a crucial prosecution witness over a tentative attorney-client relationship, appellant's appointed counsel operated under an 'actual conflict' in violation of the Sixth Amendment right to effective assistance of counsel...." *Id.* at 156. After determining that we could not resolve that issue on the existing record, we remanded the case for an evidentiary hearing. *Id.* at 164, 165. We asked the trial court to make findings of fact, in part, "on the question of [defense counsel's] actual belief on whether he was ethically constrained in cross-examining [Antonio] Murphy; its impact, if any, on [Mr.] McCrimmon's consent to his continued representation, and whether it affected the defensive strategy followed in cross-examining [Mr.] Murphy." *Id.* at 165.

After the evidentiary hearing, the trial court concluded, in part, that defense counsel "did not believe an actual conflict of interest existed when he cross-examined [the witness]," and that defense counsel "possessed a sound tactical basis for not pursuing the suggested line of cross-examination...." Mr. McCrimmon noticed an appeal; he challenges the trial court's findings and conclusions, and raises other is-

sues. Discerning no error, we affirm the judgment of the trial court.

### FACTUAL SUMMARY

During the remand evidentiary hearing, Mr. McCrimmon's new counsel, Matthew Greene, Esq. presented two witnesses: Bernard Grimm, Esq., defense counsel at trial, and Mr. McCrimmon. Mr. Grimm was asked about Mr. McCrimmon's reaction to his (Mr. Grimm's) conversation with Antonio Murphy, the "crucial prosecution witness." He replied, in part:

When I was talking to Mr. McCrimmon, I discussed with him the Mr. Murphy issue, and I think Mr. McCrimmon asked me whether he [Mr. Murphy] had hired me, and I said ... it had never gotten to that state. And he was asking questions whether it was a court-appointed case, and I told him, I said it was a single conversation, and that was it, and it never came to fruition because the fee wasn't paid. But I said notwithstanding that, when someone kind of tells you a secret over the phone, that's a secret, and if that secret can help you, it ought to be something I would bring out, and after conversations with Mr. McCrimmon, Mr. McCrimmon said that he—that he had full confidence that I would go after Mr. Murphy with everything, with both guns essentially, to use a phrase.

In response to Mr. Greene's inquiry as to whether Mr. Grimm "detect[ed] from Mr. Murphy a certain amount of animus towards Mr. McCrimmon" when he spoke with him, Mr. Grimm said: "I do remember Mr. Murphy being angry. I don't recall if that anger was targeted to anybody in particular." Mr. Greene also asked whether Mr. Grimm had "h[e]ld

---

* Judge Reid was an Associate Judge of the court at the time of argument. Her status

changed to Associate Judge, Retired, on April 7, 2011.

back on cross examining Mr. Murphy." Mr. Grimm answered:

> No, no. There was nothing that I wanted to ask that I thought the [c]ourt— there were some things that I wanted to ask that I think Judge Cushenberry ruled as an evidentiary matter that I had either already got into or that he wouldn't allow. So, in those terms there were things I wanted to ask perhaps that the [c]ourt ruled that I couldn't ask that were either nonrelevant or based on hearsay rule—I am just giving you an example of what the [c]ourt may have ruled—but there was nothing other than rulings from the [c]ourt that I wanted to ask that I chose not to ask because of some conflict. I was confident after conversations with [Mr. McCrimmon] that he believed I was committed. The reason being is after reading the transcript, I knew that the [c]ourt may ask Mr. McCrimmon questions, and I wanted Mr. McCrimmon obviously to be fully prepared on that issue.

On cross-examination, the prosecutor, Carolyn Kolben wanted to know why Mr. Grimm "did not cross examine [Mr.] Murphy about any discussions [Mr. Grimm] had with [Mr. Murphy] concerning payment of his legal fees?" Mr. Grimm indicated that he had considered the Code of Professional Responsibility provision that governs the prohibition on an attorney divulging client secrets and confidences. In the end, the Code was not controlling because, as Mr. Grimm explained, he decided not to pose certain questions for tactical reasons:

> Mr. Murphy, based on his testimony, was essentially the centerpiece, I think, of the [g]overnment's case in that I think he testified about the transfer of guns from one place to another, and then those guns, I think, ended up being the firearms used at the O Street mar-

ket. So, in order for that fact to be true, one would have to conclude that Mr. Murphy and Mr. McCrimmon were very close, or, as the phraseology is used, associates.

> So, I wanted separation tactically from Mr. Murphy, and Mr. McCrimmon fully agreed with that because Mr. McCrimmon, I think, in conversation somewhere stated that Mr. Murphy was overstating the depth of their relationship. So, I didn't want to insinuate Mr. McCrimmon and assimilate him with Mr. Murphy in questions. I wanted total separation, but at the same time [to] be able to impeach him—not your traditional impeachment, but personal[,] vindictive, retaliatory impeachment, which . . ., in at least my experience, is the best kind.

Mr. Grimm added that if he had asked Mr. Murphy about Mr. McCrimmon's role in the payment of Mr. Murphy's legal fees, and if he had elicited a response that showed Mr. Murphy was "getting back at" Mr. McCrimmon because of the nonpayment of his legal fees, that would have been "a Pyrrhic victory at most." As Mr. Grimm put it:

> [W]hat I would gain I would have lost tenfold by showing that Mr. McCrimmon, who I tried to portray to the jury as someone who is not involved in this conflict between O Street and people on L Street, would have empowered his role within the organization by being someone who calls the shots on who pays the legal fees. So, he would have paid the legal fee for someone involved in drugs and guns, which I don't think would have gone well with the jury.

In *McCrimmon I,* we said that "toward the end of [Mr.] Murphy's cross-examination, the trial judge took a five minute recess so that [Mr.] Grimm could organize a 'litany' of additional questions he wanted

to ask[, but that] [a]fter the recess, [Mr.] Grimm announced that he had no further questions." *Id.* at 165. In the course of her cross-examination, the prosecutor cited the trial transcript showing that Mr. Grimm actually informed the trial court, prior to the recess, "it may be that when the [c]ourt comes back, [he] [would] have no questions to ask." Moreover, Mr. Grimm stated that his strategy was to follow "traditional lines of cross[-]examination, a prior record if he had it, probation, parole, . . . personal bias . . . ." He was able to follow that strategy "without injuring [his] own client . . . ." There were no questions that he did not ask because of his conversation with Mr. Murphy.

During his testimony, Mr. McCrimmon claimed that Mr. Grimm told him "that he [would not] be able to cross[-]examine [Mr. Murphy] fully when he [took] the stand." The reason was "the bar"—"bar counsel, . . . whoever lawyers answer to, the bar." Although Mr. Grimm informed him that "a lawyer [would] be brought in to explain the situation to [him]" and he "would have to talk to the judge[,]" no other lawyer spoke to him about the matter, nor did the judge.[1] Mr. McCrimmon maintained that he did not tell Mr. Grimm that "it was okay for [him] to continue on as [my] attorney." Nor did Mr. Grimm ask him "whether or not he [Mr. McCrimmon] wanted [Mr. Grimm] to stay on as [his] trial lawyer." Moreover, Mr. Grimm did not "explain" conflict of interest to him. On cross-examination by the prosecutor, Mr. McCrimmon reiterated that Mr. Grimm said "he [would not] be able to fully cross[-]examine" Mr. Murphy and when

Mr. McCrimmon asked why, Mr. Grimm "said he couldn't tell me."

On August 17, 2005, the trial court orally revealed its findings, credibility determinations and conclusions. The court "d[id] not credit Mr. McCrimmon's testimony that Mr. Grimm told him that he would not be able to cross[-]examine Mr. Murphy fully when Mr. Murphy took the stand." However, the court credited Mr. Grimm's testimony and found that Mr. Grimm had: (1) considered the "[C]ode of [P]rofessional [R]esponsibility which prohibited him from divulging secrets [and] confidences of clients"; (2) decided not to "question Mr. Murphy about his anger" relating to the payment of his legal fees by "someone associated with Mr. McCrimmon" because that "line of cross[-]examination . . . would have created in a reasonable juror's mind a well-founded belief that . . . Mr. McCrimmon[ ] . . . calls the shots . . . [and] pays the legal fees for someone involved in drugs and guns," and it also "would have signaled to the jury that Mr. Murphy had information which would be [so] very dangerous to Mr. McCrimmon . . . that Mr. McCrimmon was willing to pay for a very experienced lawyer to keep him silent or to keep him from cooperating with the [g]overnment"; (3) "told Mr. McCrimmon that there was no need to cross[-]examine Mr. Murphy [about his] anger . . . [and] legal fees because the defense had already established Mr. Murphy's bias by demonstrating Mr. Murphy's belief that it was Mr. McCrimmon who had called the police on Mr. Murphy"; (4) "made a strategic decision not to cross[-]examine Mr. Murphy regarding conversations that Mr. Grimm and Mr. Murphy had when the two

---

**1.** The prosecutor recalled Mr. Grimm who said the matter of another lawyer being called in "didn't come up." On cross-examination it became clear that Mr. Grimm did not understand the prosecutor's question. Mr. Grimm clarified that he "told [Mr. McCrimmon] that if [he, Mr. Grimm] were conflicted out or removed from the case, . . . the [c]ourt would give him another lawyer." Mr. Grimm did not recall telling Mr. McCrimmon that "a third lawyer [would be brought in] to discuss the conflict issue."

were consulting about the potential attorney/client relationship"; (5) decided to "us[e] his chosen strategy of separation" because "he was able to elicit Mr. Murphy's personal bias ... without injuring his own client [Mr. McCrimmon]." The trial court also credited Mr. Grimm's testimony in finding that (1) "the [g]overnment's theory of the case, that Mr. McCrimmon was the mastermind of the conspiracy [to commit criminal offenses] would have been made more compelling" by the suggested cross[-]examination relating to legal fees for Mr. Murphy; and (2) Mr. Grimm "did not hold back on cross[-]examining Mr. Murphy because of any potential conflict of interest" and the content of his cross-examination reflected "a strategic decision."

In explaining his conclusions of law, the trial judge revealed that he had re-visited both applicable case law and pertinent trial transcripts, and had been able to resolve what he considered to be "a conflicting statement made by Mr. Grimm ... [during his] initial representations to the court before trial and the representations he made in the course of the hearing." Specifically, before trial, Mr. Grimm had identified as "a critical line of impeachment" "Mr. Murphy's anger and threat to get back at Mr. McCrimmon or his associates for failure to arrange for Mr. Murphy's representation." Given this before trial revelation, one would want to know "why didn't Mr. Grimm pursue this line of cross[-]examination at trial?"

The trial judge was satisfied that Mr. Grimm's testimony at the remand hearing "clearly refutes the natural inference that would have otherwise arisen that the failure to cross[-]examine was based upon Mr. Grimm's divided loyalty or to his loyalty to Mr. Murphy to protect Mr. Murphy's secrets." Based on Mr. Grimm's credited remand hearing testimony as well as the trial court's findings, the judge "conclude[d] as a matter of law that Mr. Grimm's failure to cross[-]examine Mr. Murphy in the area the [c]ourt said he ought to was not based upon any loyalty to Mr. Murphy, but rather reflected a sound tactical decision to avoid a line of examination which would have lent credibility to the [g]overnment's theory of the case...." The judge determined "as a matter of law that an attorney unburdened by the potential conflict that caused Mr. Grimm to seek guidance from the [c]ourt would have made the same decision." Furthermore, the judge asserted that "Mr. Grimm did not believe an actual conflict of interest existed when he cross[-]examined Mr. Murphy;" and Mr. Grimm "did not limit his cross[-]examination of Mr. Murphy because of the potential conflict of interest that arose from his conversations with Mr. Murphy." Consequently, the court declared that Mr. McCrimmon did not sustain his burden of proof by "establish[ing] an actual conflict of interest that adversely affected Mr. Grimm's performance," and that "Mr. Grimm's decision not to pursue the line of cross[-]examination suggested by the [c]ourt ... did not constitute ineffective assistance of counsel."

## ANALYSIS

Mr. McCrimmon challenges the trial court's findings and conclusions on remand, and claims reversible trial court error. In essence, he argues that Mr. Grimm had an actual conflict of interest and that a "plausible defense" was foreclosed by the conflict. Therefore, he contends, Mr. Grimm rendered ineffective assistance of counsel and Mr. McCrimmon's conviction and sentence should be vacated. We disagree.

 "An 'actual conflict,' for Sixth Amendment purposes, is a conflict of interest that adversely affects counsel's per-

formance." *Mickens v. Taylor*, 535 U.S. 162, 172, 122 S.Ct. 1237, 152 L.Ed.2d 291 (2002). Moreover, as we declared in *Veney v. United States*, 738 A.2d 1185 (D.C. 1999):

> An actual conflict of interest exists when a defense attorney is "required to make choices advancing [another client's] interest to the detriment of his [current] client's interest." *See also Winkler v. Keane*, 7 F.3d 304, 307 (2d Cir.1993) ("An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and the defendant's interests 'diverge with respect to a material factual or legal issue or to a course of action.' ") (*Cuyler* [*v. Sullivan* ], 446 U.S. [335], 356 n. 3, 100 S.Ct. 1708 [64 L.Ed.2d 333 (1980) ] (Marshall, J., concurring in part and dissenting in part)). Where a defendant has shown "that a conflict of interest actually affected the adequacy of his representation," the defendant "need not demonstrate prejudice in order to obtain relief." *Cuyler, supra*, 446 U.S. at 349–50, 100 S.Ct. 1708.

*Veney*, 738 A.2d at 1192–93 (other citations omitted). As we recognized in *McCrimmon I*, "Counsel 'is in the best position to determine when a conflict exists.' " *Id.* at 164 (citing *Mickens, supra*, 535 U.S. at 167, 122 S.Ct. 1237) (other citation omitted). "To protect [the] right to conflict-free counsel, the trial court has an affirmative duty to inquire into the effectiveness of counsel whenever the possibility of conflict becomes apparent before or doing trial." *Freeman v. United States*, 971 A.2d 188, 194 (D.C.2009) (citing *Douglas v. United States*, 488 A.2d 121, 135 (D.C. 1985)) (internal quotation marks and other citation omitted). Furthermore, "[t]he trial court's determination of whether a conflict of interest exists 'presents a mixed question of law and fact.' " *Veney*, 738 A.2d

at 1193 (citing *Derrington v. United States*, 681 A.2d 1125, 1132 (D.C.1996)) (other citation omitted). Our review is deferential. *Id.* (citation omitted).

■ Based upon our review of the record, including the trial court's findings and conclusions after the remand hearing as summarized above, we discern neither error nor clear error in the trial court's findings, and in its analysis of the actual conflict and ineffective assistance of counsel issues. Consistent with our instructions in *McCrimmon I* and the case law, the trial court focused on Mr. Grimm's actual belief as to whether he was "ethically constrained in cross[-]examining [Mr.] Murphy"; and whether his past conversation with Mr. Murphy and his representation of Mr. McCrimmon "affected the defensive strategy followed in cross-examining [Mr.] Murphy." *Id.* at 165. In light of the testimony that it heard and credited, the trial court determined that Mr. Grimm considered the ethical constraints on his cross-examination of Mr. Murphy, but that those constraints did not impact his cross-examination strategy and did not adversely affect counsel's trial performance. Rather, the trial court concluded, Mr. Grimm's cross-examination strategy was driven by a tactical decision to use traditional lines of impeachment in order to avoid the danger of depicting Mr. McCrimmon as a powerful figure who called the shots, a picture of Mr. McCrimmon which fit neatly into the government's theory that Mr. McCrimmon was the mastermind of a conspiracy to commit criminal offenses. On this record, even assuming without deciding that Mr. Grimm had an actual conflict, we see no reason to disturb the trial court's finding that Mr. Grimm had a sound tactical reason for the way in which he conducted the cross-examination of Mr. Murphy, and hence, he was not ethically constrained.

Accordingly, for the foregoing reasons, we affirm the judgment of the trial court.[2]

*So ordered.*

---

2. We are unpersuaded by Mr. McCrimmon's argument concerning the prosecutor's comment, on August 10, 2005, reminding the trial court that the victim's mother was in the courtroom. Mr. McCrimmon raised no objection at the time the comment was made and the issue was not preserved. Even if we reviewed this contention, it would be for plain error, and Mr. McCrimmon cannot demonstrate plain error on this record. *See Womack v. United States,* 673 A.2d 603, 612 (D.C. 1996). The trial judge did not rule on the motion for a new trial until August 17, 2005, after he had reviewed the case law and pertinent trial transcripts and resolved what he thought may have been conflicting statements by Mr. Grimm. Hence we see no error. Mr. McCrimmon's claim of prosecutorial misconduct due to the late disclosure of Mr. Grimm's possible conflict, a claim that he could have raised on direct appeal or in his earlier collateral appeals, is procedurally barred and, in any event Mr. McCrimmon cannot demonstrate exceptional circumstances justifying a failure to raise the claim earlier. *See Southall v. United States,* 716 A.2d 183, 189 (D.C. 1998). Finally, we are not convinced, even assuming the trial court erred in its aiding and abetting jury instruction, that there is a reasonable probability that the outcome of the case would have been different. *See Kidd v. United States,* 940 A.2d 118, 127 (D.C.2007).